In the Matter of the Estate of MICHEL BOLD, Deceased.

Surrogate's Court, New York County, February 14, 1940.

*Joseph A. Cox,* for the public administrator.

*Charles Recht,* attorney in fact for sole distributee.

Foley, S. The question presented for determination here is whether upon the evidence the surrogate shall direct the transmission of the moneys payable to a distributee, or whether they shall be decreed to be paid into court pursuant to the recent amendment made to section 269 of the Surrogate's Court Act.

The decedent died intestate and his estate was administered by the public administrator. He left a father as his sole next of kin. He resides in Odessa in the Union of Soviet Socialist Republics, formerly known as Russia. The approximate amount distributable to him is $1,500. He executed a power of attorney to Charles Recht as attorney in fact which conferred the usual authority to appear in any proceedings in this court and generally to represent the distributee in the collection of his share of the estate. Mr. Recht is the attorney at law for the Consul General of the Union of Soviet Socialist Republics and customarily represents its citizens and nationals under powers of attorney in this and other Surrogates' Courts.

The amendment to section 269 of the Surrogate's Court Act was made by chapter 343 of the Laws of 1939 and became effective on April twenty-fourth of that year. It reads: " Where it shall appear that a legatee, distributee or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld, the decree may direct that such money or other property be paid into the Surrogate's Court for the benefit of such legatee, distributee, beneficiary of a trust or such person or persons who may thereafter appear to be entitled thereto. Such money or other property so paid into court shall be paid out only by the special order of the surrogate or pursuant to the judgment of a court of competent jurisdiction." There was included in the printed legislative bill, which was subsequently enacted, an explanatory note setting forth the purposes of the amendment which, under the pertinent decisions, became indicative of the legislative intent. It reads: " This amendment is proposed by the Executive Committee of the Surrogates' Association of the State of New York. The purpose of the amendment is to authorize the deposit of monies or property in the Surrogate's Court in cases where transmission or payment to a beneficiary, legatee, or other person resident in a foreign country might be circumvented by confiscation in whole or in part. The amendment authorizes the impounding of the fund by the Surrogate to await the time when payment can be made to the beneficiary for his own benefit, use and control."

At the same session parallel amendments were made to sections 474 and 978 of the Civil Practice Act and similar explanatory notes were appended to that legislation.

These changes in the law were brought about by actual cases arising in estates where it was demonstrated that inheritances, either testate or intestate, were, after transmission, withheld or confiscated either wholly or partially by certain countries in Europe. In certain situations these seizures were motivated by religious or racial persecutions. In other cases it was found that the beneficiary was deprived of all or the greater part of the inheritance by confiscation under the guise of the imposition of excessive taxes on the right to receive the share. In other situations it was found that confiscation was disguised under the device of payment of the transmitted share to the recipient in debased coinage or paper money of the country where he resided, whereby only a very small portion of the dollar value of the share was actually paid over.

In the pending proceeding a formal hearing was had and oral and documentary evidence submitted upon the question of whether the father of the decedent would have the benefit, use or control of

the money due him and as to whether special circumstances made it desirable that payment should be withheld. It has been conclusively established by evidence to the satisfaction of the surrogate that transmission at the present time should be denied and a direction for deposit of the funds into court should be decreed.

At the outset of the proceeding here the attorney in fact attempted to raise a question involving the Constitution of the United States in that the documents which led to the establishment of diplomatic relations with the Union of Soviet Socialist Republics constituted a treaty. (Cf. *Santovincenzo* v. *Egan*, 284 U. S. 30.) These documents consisted of an interchange of communications between President Roosevelt and Mikhail Kalinin, the President of the All Union Central Executive Committee of Moscow, and Maxim Litvinoff, who was then Commissar for Foreign Affairs. The negotiations began apparently shortly before October 10, 1933, which was the date of the first letter as published in the official pamphlet of our Department of State. ("Eastern European Series, No. 1, 1933.") They were terminated on November 16, 1933, by the final exchange of communications in which the United States, through President Roosevelt, gave recognition to the Soviet Republic. It has been conclusively shown, however, that these interchanged communications, sometimes referred to as the " Litvinoff Letters," never rose to the status of a treaty. No such formal compact was ever made or ever confirmed by the Senate of the United States. At most the final arrangements of November 16, 1938, afford mutual protection for the nationals of either country when residing in the other country. The Soviet Republic gave special pledges for the protection of American citizens residing within its borders and specifically agreed " to refrain from interfering " in our internal affairs and to refrain from agitation or propaganda for " the bringing about by force of a change in the political or social order " of the United States. In addition recognition brought about the establishment of diplomatic and consular representatives in both countries.

In 1937, and in subsequent years, the " Litvinoff Letters " were extended in a limited way by a new agreement as to commercial relations only. (Executive Agreement Series, Department of State, No. 105 of 1937, No. 132 of 1938 and No. 151 of 1939 — Commercial Relations — Agreements between the United States of America and the Union of Soviet Socialist Republics.) The contention now made by the attorney for the Soviet Consul General that any treaty exists or that his nation is entitled to invoke the " Most Favored Nation Clause " under any treaty between the United States and any other country is, therefore, unfounded in fact and in law. His

contention is utterly destroyed by the recent certification of Mr. Cordell Hull, Secretary of State of the United States, which has been received in evidence, that " there is not any treaty in force between the United States and the Union of Soviet Socialist Republics," and that the exchange of official communications made in 1933 and in subsequent years " had not contained any provisions relating to the administration or settlement of estates."

Upon the remaining principal question the surrogate holds that it has been proved by the evidence that the father of the decedent as his sole next of kin would not have the " benefit or use or control " of the moneys if they were transmitted to him.

His attorney in fact has attempted to prove here that there is a form of ownership of private property to a limited extent under the present Constitution and laws of the Soviet Republic and that there is a statutory recognition of a right to take by inheritance by a Soviet citizen from a New York decedent. It is conceded that there is no right to inherit land, since it is a primary principle of their form of government that real property is owned by the State. A New York attorney was called by the attorney in fact to testify to the Soviet Constitution and statutes. Despite his demonstrated industry and research, it is difficult to accept his opinion of these legal rights because of his relatively brief experience in his law course in Moscow and his lack of experience in the actual operation of the specific question here — the transmission and beneficial enjoyment of estate funds. Undoubtedly there is a form of ownership of certain private property to a restricted degree in the Soviet Union. It may include clothing, household goods, savings bank deposits, or even small dwelling houses or other improvements of realty, but separated from the ownership of the land itself.

It is also difficult for one who has studied and observed the processes of our own American law of inheritance to reconcile the privileges granted by the Constitution and laws of the Soviet Union with their actual operation or the existence of the rights of its citizens in its totalitarian form of government. While it is not important here, the right of inheritance by its citizens from a deceased citizen seems to be confined to descendants or a surviving spouse or to those actually receiving support from the deceased for not less than one year before death. (Soviet Law, an Introduction by John N. Hazard, 36 Col. Law Review, 1236.) In all other cases escheat to the government occurs.

Testimony was also given by those who urge a transmission of the moneys, as to the economic conditions in the Soviet Union and the alleged beneficial use which recipients of funds would enjoy. This testimony, however, has been entirely overcome by the docu-

mentary and oral testimony submitted by the public administrator of New York county in support of his contention that the funds should be retained. Mr. Joseph A. Cox, his counsel, with commendable zeal has developed important lines of evidence actuated only by a desire to present the true facts for the guidance of the surrogate.

Dr. David H. Dubrowsky testified convincingly as to the true conditions of transmission and receipt of funds, based upon his experience over a period of nineteen years. In 1921, at a time when there were no diplomatic relations between the United States and Soviet Russia, he was appointed by the latter government as the official head of the Russian Red Cross Society in the United States. In that capacity he functioned from 1921 to 1935 in the supervision of the collection and transmission of veterans' benefits and war risk insurance moneys granted by the United States government. He is a naturalized citizen of the United States. He had exclusive control in the entire United States of transmissions from American estates to Russian distributees until the year 1932. Thereafter, Mr. Recht, the attorney in fact here, assumed that duty. Special opportunity and experience in observing these processes were available to Dr. Dubrowsky. In the intervening years and up to the present time he appears to have continued his general familiarity and contact with these subjects. In the earlier period immediately after the World war no transmissions of government moneys were countenanced by our Veterans' Administration Bureau. When transmissions to the Soviet Union were authorized, it was only on specific pledges and assurances given by Soviet officials that the transmitted funds would be honestly paid to the beneficiaries. Even then in the succeeding years constant complaints of confiscation or of payments made in depreciated currency were presented to our government.

It is Dr. Dubrowsky's testimony that under present conditions in the Soviet Union the beneficiary of this estate, instead of receiving the equivalent of $1,500, which is the amount of his distributive share, would be paid in depreciated rubles the equivalent of thirty dollars of our money and the balance of $1,470 would be confiscated by the Soviet Union. There is opposing testimony in the record that under the present alleged rate of exchange, the beneficiary would receive at most twenty per cent of his share in dollars. Even under the most favorable circumstances, therefore, he would get the maximum equivalent of $300 in rubles and there would be confiscated by the Soviet government the balance of $1,200. We thus have a minimum beneficial use of the equivalent of thirty dollars or a maximum of $300. Moreover, even this situation is complicated

by the fact that there is no actual rate of exchange existent today between the United States and the Soviet Union, as there exists between this country and other countries. All international trade is concentrated in the Soviet government. Private business enterprises and the international interchange of goods between private persons there and here do not exist. Private banking in the Union of Soviet Socialist Republics is prohibited and even the possession of foreign exchange is illegal except through the State Bank. The Soviet Union buys and sells in the United States not in rubles, but in our dollars. The State Bank, representing the Soviet government, arbitrarily fixes in the Soviet Union the value in rubles of the dollar.

It was also testified to by Dr. Dubrowsky that the moneys of American estates were purposely held in America to support the credit of the Soviet government here. With these and other proofs it has been shown conclusively that the amount which the beneficiary here will actually receive is inconsequential when compared with the value of his share in dollars.

The system of inheritance of our State contemplates that a beneficiary wherever situated shall be paid in full and without expropriation by a foreign country. The individual legatee or next of kin is made under our law the recipient of the inheritance. It is not intended that a foreign government, of which the beneficiary is a national, should be the object of the testator's bounty, nor that the right to succeed to the property of a New York decedent should be diverted from the statutory next of kin to a foreign power. From a selfish consideration, the State of New York might, under its inherent constitutional power, have enacted a statute which would escheat the moneys in such situations to its own government under its recognized right to regulate or even withhold the privilege of inheritance. To the contrary, the amendment to section 269 of the Surrogate's Court Act made in 1939 was extremely beneficial in its purpose. It contemplated no forfeiture to our State of the legacy or distributive share of the foreign beneficiary. It was intended to safeguard his rights by permitting the moneys to be held until the time when it might be shown that the beneficiary, and he alone, would receive the funds. " This statute, far from constituting an impairment of his rights, was designed to be, and is, in fact, a valuable protection thereof." (*Matter of Landau,* 172 Misc. 651.) In the latter case, Surrogate WINGATE discussed the effect of the amended form of section 269 in its relation to a Soviet distributee of a New York resident and reached a similar conclusion to that here.

In the pending proceeding the moneys due the father of the decedent are directed to be deposited with the city treasurer to await adequate and satisfactory proof that the beneficiary will be paid his share in the fair equivalent of American dollars without confiscatory reduction or outright expropriation.

Submit decree on notice settling the account and directing distribution accordingly.