7 N.J. Super. 455 (1950)
71 A.2d 665
IN THE MATTER OF THE ESTATE OF JOHN URL. DECEASED.
Superior Court of New Jersey, Somerset County Court Probate Division.
Decided February 14, 1950.
*456 For the plaintiff executor, Messrs. Bowers & Rinehart, by Mr. James I Bowers.
For Dr. Lajos Kadar, Acting Consul General of the Hungarian Republic, as Attorney in Fact for Arva Haz of Szekesfehervar, Szekesfehervar, Hungary, Mr. Ernest P. Biro.
For Julia Url Hordai, Sandor Url, Maria Url and Gyorgy Url, Messrs. Brunetto & Welsh, by Mr. Francis F. Welsh.
*457 SMITH, ARTHUR B., J.C.C.
On December 24, 1948, the first and final account of Alfred C.B. McNevin, executor under the last will and testament of John Url, deceased, was brought on for settlement and allowance before this Court. The matter was continued to January 14, 1949, at the request and with the consent of the attorney for the executor and the attorney for the Acting Consul General of the Hungarian Republic in New York City, who was acting pursuant to a power of attorney executed and filed on behalf of Arva Haz of Szekesfehervar, Szekesfehervar, Hungary, designated as the residuary legatee under the will of the decedent. On the latter date, it appeared that there was no dispute with respect to the accuracy of the executor's account and no exceptions thereto were filed. The only matter then appearing to be in dispute was the question of the counsel fee to be allowed to the attorney for the executor and the amount of commissions to be allowed to the executor. The Court indicated that the account would be allowed as filed; that the executor would be allowed commissions at the rate of five per cent, but reserved decision on the question of counsel fees to be allowed to the attorney for the executor until a memorandum with respect thereto should be filed with the Court. Subsequently, on January 28, 1949, there was presented to the Court a form of judgment allowing the executor's account, the executor's commissions and allowing to the attorney for the executor a counsel fee of $7,000. The making and entry of the judgment and the allowance of the executor's commissions and counsel fees to the executor's attorney were consented to by the attorney appearing for the residuary legatee and the judgment was thereupon signed and entered.
The judgment allowing the account, among other things, "Ordered that the residue of said estate, after the payment of the commissions and fees above set forth, is to be held by said executor and to be distributed by him in accordance with the last will and testament of the decedent, John Url." The executor thereafter apparently chose to wait until the expiration of the time for appeal from the judgment of this Court before attempting to make distribution of the residue of the estate in accordance with the provisions of the testator's *458 will and, while so waiting, became concerned as to whether or not, under existing conditions, he would be justified, and be properly discharging his duty, by paying over the residue of the estate remaining in his hands to the Acting Consul General of the Hungarian Republic at New York City by virtue of the power of attorney above mentioned. On April 5, 1949, the attorney for the Hungarian Acting Consul General at New York acknowledged service of a notice from the attorney for the executor to the effect that the executor would, on April 22, 1949, make application to this Court for a judgment upon the executor's request for directions as to the distribution of the estate. This notice and the executor's complaint were both filed with the Surrogate on April 6, 1949. In his complaint the executor, among other things, alleged that there remained in his hands for final distribution the sum of $52,297.47, all in cash deposited to his credit in the Empire Trust Company, New York City, N.Y. He further alleged "that there is grave doubt in his mind as to the existence of said Arva Haz of Szekesfehervar, the beneficiary entitled to the residue of the estate of said John Url, deceased, and * * * that there is a question as to the propriety of paying the said residuary estate in view of existing political and economical conditions in Hungary." He respectfully demanded that a judgment be entered "determining the existence of said Arva Haz of Szekesfehervar, beneficiary under the last will and testament of said John Url, deceased, and that said Judgment further direct the plaintiff as to whether or not payment of the net estate should at this time be made to said beneficiary, its agent, attorney or representatives." On behalf of the Hungarian Acting Consul General at New York, there was filed an answer to the executor's complaint denying that there were "any grounds in law or otherwise which should give to the Executor any doubts as to the existence of said Arva Haz of Szekesfehervar * * * because the said Executor has been shown an official certificate under the signature and seal of the Mayor of Szekesfehervar and under the signature and seal of the Bishop of Szekesfehervar, both charged with the duty of the conduct and management of said orphanage, certifying *459 that the said orphanage exists and functions unchanged and that nothing will hinder the appropriate use of the funds left for the benefit of the said orphanage." The answer further alleged that "the said Bishop and the said Mayor have declared under oath that the funds so received by them will be used exclusively for the maintenance and education of the orphans of said orphanage and that the said bequest will remain the property of the orphanage and will not be confiscated by the State." Hearing and consideration of the executor's application for instructions was continued from the date for which notice was originally given to May 6, 1949. On this date there appeared in Court not only the executor and his attorney and the attorney for the Hungarian Acting Consul General at New York, but also Francis F. Welsh, Esquire, of the firm of Brunetto & Welsh, members of the Bar of this State, who at that time claimed to be appearing for certain next of kin of the testator, whose names he did not then wish to divulge for fear of possible retaliation against them for daring to urge a claim in opposition to that contended for on behalf of the present Hungarian governmental officials. It will be recalled that this was shortly after the much publicized arrest and alleged trial of Cardinal Mindszenty and other religious leaders, and the efforts to subordinate the will and teachings of the religious leaders to the will of those then in positions of governmental authority, in territory occupied or under the domination of the forces of the Union of Soviet Socialist Republics. By virtue of what had become matters of public knowledge through information released to the press through the State Department of our own Government, this Court was at that time unwilling to assume, without adequate proof independently obtained, that the orphanage which was the object of the testator's bounty as expressed in the residuary clause of his will was in fact still in existence, or, if it was, that the monies which it was entitled to receive from the executor of the above named estate would, if paid over by the executor to the Hungarian Acting Consul General at New York, reach the orphanage without confiscation or substantial diminution, or that it would be permitted to be used by the orphanage for its customary *460 purposes as when it was known by the testator and as the testator undoubtedly assumed when making his will. It might be well to here quote the residuary clause of the will:
"FOURTEENTH: All the rest residue and remainder of my estate, both real, personal and mixed, wheresoever situate, including all lapsed legacies, I hereby give devise and bequeath for the benefit of ARVA HAZ OF SZEKESFEHERVAR in the CITY OF SZEKESFEHERVAR, HUNGARY, under the joint control of the city administration and the Roman Catholic Bishop of SZEKESFEHERVAR, no portion of either principal or interest to be used for any other than the designated purpose. This bequest is made in remembrance of the good deeds done in the past for the orphan boys and girls by the CITY OF SZEKESFEHERVAR."
After hearing the arguments of counsel, this Court announced that the matter would be taken under advisement and that an effort would be made by the Court to obtain the cooperation and assistance of the Department of State of our Federal Government in an effort to ascertain whether the orphanage continued to exist at this time and, if so, whether the funds, if paid over by the executor to the Hungarian Acting Consul General at New York, would not be confiscated; would reach the orphanage without substantial diminution, and be permitted to be used by the orphanage for the accomplishment of the purposes apparently intended by the testator. The matter was, therefore, continued without specific date. The assistance of the Department of State of the United States was promptly sought by the Court and, at the Court's request, the matter was referred to the American Legation at Budapest, Hungary, with the request that discreet inquiries be made concerning the existence of the orphanage. Under date of June 7, 1949, the Department of State forwarded to this Court a report of the investigation made through the American Legation at Budapest to ascertain the present status of the orphanage. This report was based upon interviews at Szekesfehervar and a visit at the orphanage by a member of the Legation staff. The report stated among other things:
The institution (orphanage) has been nationalized for the past four months and a woman by the name of Mrs. Stephen *461 Gyimoti was appointed head of the orphanage. The institution was previously managed by twelve Catholic nuns who, according to Mrs. Gyimoti, were "misusing funds" and were forced to resign, under the nationalization law. Mrs. Gyimoti stated that "horrible social conditions" in Hungary in the past made her become an ardent Communist. She claimed that she and her two assistants could work better than the twelve nuns in the past and stated that funds for the orphanage are obtained from the town; that she gets the funds from the Mayor's office, keeps an account in a book, and after the end of each month, reports on expenditures at the offices of the City Hall. Mrs. Gyimoti claimed the nuns resigned voluntarily. There were the same number of children at the orphanage as before nationalization took place. Qualifications for admission are the same as before. Orphans get religious instructions only at the schools 2-3 times weekly from priests and nuns, various religions being represented. The present director claimed the orphans were completely neglected under the nuns, stating they "ate-up" the food from the orphans and this was one of the reasons why they were forced to resign; that they occupied the entire first floor of the building, jamming the orphans in the basement rooms; that "thanks to the nationalization" another bathroom had been added, and that some relief goods the institution received were completely useless and she intended to donate them to other institutions where they could be of better use. When asked who would get the fund and how it would be used, in case the transfer from the United States came through, the director answered that the funds would be appropriated to her and that she would keep an account of every expense and report on it to the City Hall of Szekesfehervar. The report further indicated that the original site of the orphanage was destroyed during the war and that at present it was operating in a building which was formerly a public school. Before nationalization took place the orphanage was a society under the Church directed by a chief nun who had eleven nuns under her. The report concluded as follows:
"On account of the changes which have occurred in the physical buildings and equipment of the orphanage, and especially on account *462 of the transfer of the direction and administration of the institution from the Catholic religious order to the Communist local authorities, it is thought probable that the testator's intended purposes would not be accomplished by the delivery of the funds at the present time to the Hungarian Consul General in New York and the Hungarian Government. Furthermore, the present dollar exchange rate arbitrarily fixed by the Hungarian Government (which is from one-fourth to one-sixth of the real purchasing value of the dollar) and existing Hungarian foreign exchange regulations, would cause from three-fourths to five-sixths of the total amount of these funds to be diverted from the orphanage to other uses of the Hungarian Government, if that Government presently receives these funds.
"With regard to the charges said to have been made against the nuns, leading to their forced or `voluntary' removal from the orphanage, it may be said that this action on the part of the Hungarian local authorities would appear to have been of the same general nature as other cases which have been the subject of recent condemnatory statements by the Secretary of State and others speaking for this government."
Enclosed with the report and as a part thereof were copies of Department of State Press Releases No. 77 dated February 9, 1949, and No. 212 dated April 1, 1949, together with United States United Nations Delegation Press Release No. 602 dated April 18, 1949.
The contents of the above mentioned report from the Department of State were withheld by the Court until after the receipt of a communication from the Department dated June 12, 1949, advising that the Department had no objection to filing the report and making copies thereof available to the parties concerned. Promptly thereafter copies of the report were made and, under date of June 23, 1949, forwarded to each of the attorneys concerned, and the original was then filed with the Surrogate.
On July 29, 1949, the various parties, by their attorneys, again appeared before the Court to further argue the matter in the light of the report received from the Department of State. It was then contended by the attorney for the Hungarian Acting Consul General at New York, among other things, that the attorney appearing for the alleged next of kin of the decedent had no right to appear or be heard in the matter because the next of kin had no interest in the fund under consideration and, further, because the parties *463 for whom he claimed the right to appear and act had previously given a power of attorney to the Hungarian Acting Consul General of New York authorizing him to represent them "with full powers in the estate matter of John Url," which power of attorney was on file with the Surrogate. He, therefore, claimed the right to represent these parties through his representation of the Hungarian Acting Consul General notwithstanding the fact that it now appeared that the interests of these alleged next of kin might be in substantial conflict with the interests of the orphanage, for which he also claimed to act. Subsequently, Mr. Welsh, on behalf of the alleged next of kin, filed an answer and counterclaim alleging that the orphanage mentioned in the residuary clause of the will had ceased to exist; that, therefore, the legacy had lapsed, and that the next of kin were now entitled to the residue of the estate. He also gave notice, returnable on September 9, 1949, of an application for an order admitting the alleged next of kin as parties defendant. This matter was adjourned to September 16, 1949, at which time all of the parties were again before the Court and argued this and related matters. Counsel for the Hungarian Acting Consul General again strenuously opposed admitting the next of kin as parties to these proceedings, as well as Mr. Welsh's right to represent them. Thereafter, in support of his motion, Mr. Welsh submitted an affidavit, in which, among other things, he asserted that the firm of Brunetto & Welsh were "attorneys for the defendants, Julia Url Tordai, Sandor Url, Maria Url and Gyorgy Url," and indicated in a general way what his firm had done in behalf of their clients after having been retained. Attached to the said affidavit were copies of two letters, each dated April 5, 1949, and each purportedly signed by Julia Tordai, one of which was directed to his associate, Mr. Brunetto, but the other of which does not appear to be addressed to any particular person, although obviously, from its context, intended for Mr. Brunetto. The letter directed to Mr. Brunetto specifically authorized him, or his partner, Mr. Welsh, or any other counsel to be appointed by him, to represent her before any judicial or other *464 authority in the procedure to be had in the matter of the estate of her uncle, John Url, indicating that she wanted "to have only a decision of court of inheritance" and that she wished to be represented "only in case of having chance of the mentioned decision of court." In the other letter of the same date, Mrs. Tordai expressed sorrow that she could only give authorization in her name and that her relatives "would give an authorization only in case of without suit." The letter seems also to suggest that if the other relatives can, without suit, obtain a share in the estate they would be willing to sign an authorization. Mr. Welsh further stated in his affidavit that his firm had written their clients numerous letters advising them with respect to these proceedings and that, with one exception, their letters were unanswered. "The exception was the letter sent to us via the Hungarian Consul in New York, and this letter, strangely enough, was able to be delivered to us by the Consul." Thereafter Mr. Biro submitted a "Memorandum addressed to Affidavit of Mr. Welsh." Attached to his memorandum are photostatic copies, with English translations thereof, of two letters, each dated June 1, 1949, and each signed by Mrs. Tordai, one addressed to Brunetto & Welsh and the other addressed to Hungarian Consulate General, New York, enclosing, for forwarding, the letter to Brunetto & Welsh. This letter addressed to Brunetto & Welsh appears to be the "one exception" referred to in Mr. Welsh's affidavit. This letter of June 1, 1949, refers to Mrs. Tordai's previous letter of April 5, 1949, and to a communication received from Brunetto & Welsh on May 17, 1949, and then purports to withdraw the right of representation previously given. It is most interesting to observe that on or about June 21, 1949, the Surrogate received a letter, dated June 10, 1949, purportedly signed by Julia Tordai, expressing her understanding "that in the affair of the legacy left by my uncle, John Url * * * there will be held new proceedings, which will settle the question, if the remaining part of the legacy should go to the institute or the nearest relations of the deceased." She therein indicated that she was a niece of the deceased; that the deceased *465 still had a brother and two sisters living in Hungary who "did not authorize me to give their names, but I think it right." She concluded her letter by saying: "I believe that their authorization given to the Hungarian Consulate in the beginning of 1948 is still valid for this case. Should it not be, then beg the kind arrangements of the Court."
It seems quite apparent from the language of Mrs. Tordai's letters of June 1, 1949, that they were prepared for her by someone having more definite knowledge with respect to the status of the proceedings and being more trained in the preparation of letters of this character than she. She apparently had previously written and forwarded her own letters of April 5, 1949, to Mr. Brunetto and her subsequent letter of June 10, 1949, intended for the Clerk of this Court (Surrogate). Why then was it necessary that the letter of June 1, 1949, be written for her by someone else and forwarded only through the Hungarian Acting Consul General rather than directly to Brunetto & Welsh? This circumstance leaves in the mind of this Court serious doubt as to whether the letter of June 1, 1949, was the voluntary act of Julia Tordai.
It is difficult for this Court to understand how Mr. Biro, or any attorney, could, in good conscience, seriously contend for a right to represent conflicting interests in the same proceeding. Of course, he attempted to justify this right by his assertion that the orphanage took the entire residue; that the next of kin had no interest, and that, therefore, there was no conflict. This, of course, was the exact matter which gave rise to the conflict. Mr. Welsh, appearing on behalf of the next of kin, contended that the orphanage which was the object of the testator's bounty in fact no longer existed, as indicated by the State Department report, and that, therefore, there was an intestacy as to the residue of the estate, entitling the next of kin to the distribution thereof. Mr. Biro, of course, placed great reliance upon the certificate of the Mayor and Bishop of Szekesfehervar mentioned and referred to in his answer to the executor's complaint filed herein. This Court regards the statements contained in that certificate as purely self-serving declarations, which should *466 not and cannot be the basis for the ultimate determination of this matter. The next of kin have a right to be represented in this matter by independent counsel who are concerned with no interest other than theirs. The attorney acting herein for the Hungarian Acting Consul General could not properly and should not, under the circumstances here prevailing, attempt to represent them. Were they in a position to freely express their wishes in this matter (and as to this the Court entertains doubt) it can be fairly assumed that they would retain counsel able to advance their cause unhampered by any other conflicting interests. If necessary to serve the ends of complete justice, the Court might well appoint counsel to represent the interests of those in such position as to cast doubt upon their ability to make a free choice of counsel. It is entirely appropriate that the interests of the next of kin should be represented by independent counsel in the proceedings leading to the determination of the primary issue hereinafter to be discussed and determined. Were next of kin to be precluded from being heard in a proceeding of this character, it is possible that a determination could be made which would result in their never having their day in Court and possibly in a miscarriage of justice. For the reasons herein expressed, the next of kin will be admitted as parties to this proceeding and the Court will recognize the firm of Brunetto & Welsh as attorneys for the next of kin of John Url, deceased, in these proceedings. The motions made on behalf of the Hungarian Acting Consul General to strike from the record all pleadings and other documents filed in behalf of the next of kin are, therefore, denied. This action is not to be interpreted as indicating any opinion on the part of the Court as to whether the next of kin have, or may hereafter have, a valid claim to the residuary estate, but only that they have such an interest in the matter as to require that they be admitted as parties and be permitted to be heard in this proceeding.
The same principles which preclude the attorney for the Hungarian Acting Consul General from also acting as attorney for the next of kin of John Url, deceased, in these proceedings *467 apply with equal force to preclude the Hungarian Acting Consul General from acting for the next of kin in these proceedings under or by virtue of the power of attorney heretofore filed in this Court.
While having the matter still under consideration, the Court received a further communication, bearing date November 28, 1949, from the Department of State, enclosing a copy "of an unclassified report No. 220, dated October 21, 1949, from the American Legation at Budapest, which contains the text of Hungarian Decrees extending government control over all kinds of foundations." The report referred to "enclosed translations of decree of legal force No. 2/1949 of the Presidium of the Hungarian People's Republic promulgated in the Official Gazette No. 181 of August 30 regulating certain questions in connection with foundations, and of decree No. 4, 245/1949 (195) M.T. of the Cabinet Council promulgated in Official Gazette No. 195 of September 20, 1949, enforcing the above decree of legal force." The report states: "The above decrees are supposed to extend a more effective control upon all kinds of foundations existing at present and upon foundations to be established in the future." The letter from the Department of State, together with the enclosed report therein referred to, has been filed by the Court with the Surrogate. The term "foundation" as used in the text of the decree would appear to include charitable organizations, such as the orphanage mentioned in the residuary clause of the testator's will. The decree, in the opinion of this Court, indicates such a substantial tightening of restrictions on such "foundations" as might conceivably lead to their ultimate dissolution.
Several issues have been raised during the progress of these proceedings which, in the light of the ultimate disposition to be herein expressed, appear to be premature and not to require determination by the Court at this time. Included in such issues are (1) the interpretation of the residuary clause of the testator's will; (2) whether the orphanage which was the object of the testator's bounty exists in such manner as to entitle it to now receive the residuary estate; *468 (3) if it does not so exist, whether the cy pres doctrine should now be applied; (4) whether the residuary bequest has lapsed, and (5) whether there is an intestacy with respect to the residue entitling the next of kin to the distribution thereof. For the present, it appears that these proceedings can be concluded by a determination of the primary question raised by the executor's complaint seeking the instructions of the Court "as to whether or not payment of the net estate should at this time be made to said beneficiary, its agent, attorney or representatives."
While the attorneys for the respective parties have submitted memoranda of law on various collateral phases of this matter, none have touched upon the law involved in the primary issue and none have referred to either the statutory provisions or the judicial determinations which will be hereinafter cited. In 1940 our Legislature adopted a statute, which became effective June 24, 1940, as Chapter 148 of the Laws of that year (L. 1940, c. 148, p. 315; N.J.S.A. 3:26-18). This statute is entitled, "An Act authorizing the withholding of legacies, distributive shares and trust funds in certain cases," and is in the following language:
"Deposit in court of money or other property of legatee, next of kin or beneficiary of trust in certain cases.
"Where it shall appear that a legatee, next of kin or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld, the court by which the fiduciary was appointed, or, in the case of a trust where the trustee was appointed other than by a court, the Court of Chancery, on motion of any party, or, failing such, on motion of the Attorney-General, or on the court's own motion, may direct that such money or other property be paid into such court for the benefit of such legatee, next of kin, beneficiary of a trust, or such person or persons who may thereafter appear to be entitled thereto. Such money or other property so paid into court shall be paid out only by the special order of the court."
The purpose of this statute was set forth in the statement attached to Assembly Bill 231, which became the quoted statute, as follows:
"The purpose of this statute is to authorize the deposit of monies or property in the appropriate court in cases where the transmission *469 or payment to a beneficiary, legatee or other person resident in a foreign country might be circumvented by confiscation in whole or in part, as in foreign countries where assets belonging to individuals, especially when in the form of foreign credits, are often seized and wholly or largely appropriated by the Government. This statute authorizes the impounding of the fund by the court to await the time when payment can be made to the beneficiary for his own benefit, use and control. This statute is substantially similar to a recent New York statute amending section 269 of the New York Surrogate's Court Act."
There appears to be no reported judicial opinion by any court of this State interpreting the provisions of the above cited statute. This Court, therefore, turns to judicial interpretations and applications by the New York courts of the statute previously adopted by that State and after which our New Jersey Act was patterned. The New York statute was enacted in 1939 as an amendment to section 269 of the New York Surrogates Court Act and its language is identical with the New Jersey Act, save only in those instances where changes were necessary to make it applicable to the court organization and practice in our State. The explanatory statement attached to the New York legislative bill was also in language almost identical with the statement appended to our Assembly bill.
So far as is disclosed by the reported opinions of the New York courts, it appears that Surrogate Wingate, of Kings County, whose judicial office is comparable to that of this Court sitting in the Probate Division, has probably had the most extensive experience in dealing with cases similar to the one now under consideration. His reported opinions in such cases appear to have been very well considered and it is significant that, at least so far as is disclosed by the law reports, none of his judgments in these cases appear to have been reversed or reviewed by any appellate court. No useful purpose would be served by endeavoring to re-state in different words the language employed by him in his reported opinions and they will, therefore, be referred to and quoted at some length.
The first of his reported opinions appears in the case of In re Weidberg's Estate, 172 N.Y. Misc. Reps. 524, 15 *470 N.Y.S.2d 252 (1939), where the question under consideration was whether it was within the authority or was the obligation of the Surrogate's Court to direct the payment into Court of the distributive shares in the estate, of four German nationals, apparently of the Jewish race, or whether the sums in question may, or must, properly be paid to the German Consul in New York City, or his attorneys. In support of the contention of the German Consul, or his attorneys, that these sums should be paid to him or them, there was presented a "Power of Attorney  Vollmacht" in what the Surrogate called "a stock form of the German Consular Service with which this Court has become quite familiar" and which accorded "the donee the broadest conceivable authority to deal with the interests of the donors in the estate of the decedent." The power of attorney designated "the German Consul at the City of New York, or his representative or successor in office, William J. Topken and Philip F. Farley, attorneys for the German Consulate General, 17 Battery Place, or any one of the aforesaid alone, our true and lawful Attorney in Fact." One of the donors of the power of attorney appeared to have acknowledged the execution thereof before the United States Consul in Berlin, Germany, and another before a Notary Public and Public Prosecutor in Sweden, whose authority in this regard was certified by the United States Consul at Goteborg, Sweden.
After quoting the provisions of Chapter 343 of the Laws of 1939, adding to paragraph 269 of the Surrogates Court Act, the Court said:
"At the time of its enactment, a note, explanatory of its scope and purpose, was appended to the bill. This must be considered in any interpretation of its effect. (Citing numerous authorities and quoting the note.)

* * * * * * *
"The conditions in certain foreign countries which motivated these enactments are matters of common knowledge. Under certain foreign governmental systems private ownership of property was and is either wholly or partially prohibited. In others assets belonging to individuals, especially when in the form of foreign credits, are either seized and wholly appropriated by the authorities or are subject to compulsory exchange for local currency at a fraction of their intrinsic value.
*471 "As a result of these practices, benefits which an individual decedent had dedicated to indicated beneficiaries, either by express testamentary instrument or by its virtual substitute of a `statutory will' (Matter of Williams' Estate, 162 Misc. 507, 509; 295 N.Y.S. 56; affirmed, 254 App. Div. 741, 4 N.Y.S. 2d 467) under the statute of distribution, were diverted from their intended recipients to the promotion of international banditry and the propagation of ideologies which are a complete antithesis of the conceptions of a vast majority of American citizens and which have now plunged the continent of Europe into a second great war.
"The primary object of this legislation was to promote the basic object and obligation of courts of decedent devolution to use their utmost endeavors to effectuate the express or implied wishes of a decedent respecting the disposal of his assets on death. Only subordinate to this purpose was the effort to prevent the diversion of assets here located to foreign governments whose conceptions of the proprieties were totally at variance with those which form the basis of the national existence of this country.
"According to the terms of the statute, payment into court may be directed `where other special circumstances make it appear desirable that such payment * * * be withheld.' The nature of such special circumstances envisaged in the enactment is clarified in the note which states that it is applicable `in cases where transmission or payment to a beneficiary, legatee, or other person resident in a foreign country might be circumvented by confiscation in whole or in part' (italics not in original).
"The italicized word `might' is the preterit of the word `may' and is equivalent to `had power' or `was possible' (Owen v. Kelly, 6 D.C. 191, 193) or, as defined in the Standard Dictionary, `have the physical or moral opportunity * * * to be contingently possible.'
"The question is, therefore, whether it is `contingently possible' that the sums due these distributees would be subject to confiscation in whole or in part if turned over to the German Consul or his attorneys.
"The answer to this question must be in the affirmative * * *.
"The question thereupon arises as to whether an exercise by the Court of the authority accorded by the amendment to paragraph 269 of the Surrogates Court Act would violate the provisions of any controlling law" * * *.
"The main argument of the attorneys for the German Consul is, however, directed to their right to receive payment of the distributive shares of the adults. Their thesis on this phase of the controversy is predicated on the premise that they were individually designated as attorneys in fact by the Power hereinbefore noted, and that there is no reason why they cannot, as individuals, carry out the obligation which would arise if the distributive shares were paid to them, of transmitting the avails to the adults."
After referring to the fact that, according to the terms of the power of attorney, the attorneys were therein named as *472 "Attorneys for the German Consul General," the Surrogate continued:
"When read in their context, it is obvious that the italicized words are not mere descriptio personarum but are an essential part of the appointment, and that this is of the German Consul or his representative or successor or attorneys; in other words, of a representative of the German government in his capacity as such. It must follow that, as mere individuals, no authority has been accorded to them, and that collection by them other than in their capacities as attorneys for the German Consul General would be unauthorized.
"In view of this fact, there is present in respect of the distributive shares of these adults the same contingent possibility which has heretofore been considered, in the evaluation of the rights of the Consul under the treaty, that if payment thereof were made to the German Consul or his alter ego, the rightful recipients might not receive them. This again makes the terms of paragraph 269 of the Surrogates Court Act applicable."

* * * * * * * *
"An inevitable implied term of this, and every other, Power of Attorney is that it confers upon the donee only such authority as may be permissible of exercise under the laws of the place in which action thereunder is contemplated. The law of the State of New York forbids payment other than to the individual distributee, of sums which may be due him in situations in which there appears to be a reasonable possibility that he will not receive the benefit thereof. This deprives him of no right, since the money is always available to him and is his for the asking at any time that reasonable assurance is forthcoming that he, and he alone, will get it. This statute, far from constituting an impairment of his rights, was designed and in fact is, a potent protector thereof.
"The Attorney in Fact possesses no personal rights whatsoever under the Power. If the money were paid to him he would receive it solely as a trustee for his principal. So far as concerns any right to remuneration which he may possess, these are predicated solely on the value of the services which he may have performed in the past, and are not determinable in accordance with the Power, except to the extent that it may demonstrate that his actions were not those of a volunteer. If, therefore, his delegated authority is held to be circumscribed by an application of paragraph 269 of the Surrogates Court Act, he is in precisely the same position as if his authority for further action had been terminated by the death of the donor of the Power or some act of revocation of the authority previously accorded.
"The attorneys here involved should be permitted a reasonable opportunity to ask remuneration for the services which they have performed up to the present time." * * *
*473 In the case of In re Blasi's Estate, 172 N.Y. Misc. Reps. 587, 15 N.Y.S.2d 682, Surrogate Wingate pointed out that the conclusion reached by him in the Weidberg case "was obviously predicated upon three premises, namely, first, that there was no controlling law which compelled payment to the Consul; second, that there were reasonable grounds for belief that if paid, the distributees would not have the benefit of the money; and, third, that an obligation was imposed upon the Court by the 1939 amendment to paragraph 269 of the Surrogates Court Act to direct deposit with the city treasurer in situations in which an affirmative factual finding was attained that distributees would not have the benefit of the money. Each of these premises is indispensable to the attainment of a similar result, and their presence or absence in the case at Bar is, therefore, necessary of evaluation."
In the case of In the matter of the Estate of Hyman Landau, also known as Chaim Landau, deceased, 172 N.Y. Misc. Reps. 651, 16 N.Y.S.2d 3 (1939), Surrogate Wingate again had under consideration the application of the Attorney General of the State of New York to direct payment to the city treasurer pursuant to section 269 of the Surrogates Court Act of the distributive share of a national and citizeness of the Union of Soviet Socialist Republics, then residing in the territory formerly known as Russia. The distributee was represented in the proceeding by an attorney in fact, resident in New York, who asserted a right to receive the distributive sum. The execution of the document purporting to evidence his authorization was stated to be attested by "Peoples Judge, Gurvitch," and his authority authenticated by Citizen Dybchenko, and the regularity of the foregoing certified by Acting Chief I. Mikhailov, of the Peoples Commissariat for Foreign Affairs. There was no claim made in this case by a Soviet Consul pursuant to any treaty rights. The claimant was a mere attorney in fact of the Soviet national. In his opinion, the Surrogate stated that "the primary inquiry is as to whether, were the money to be paid over, the `distributee * * * would * * * have the benefit or use or control of the money or other property due him * * *,' within *474 the contemplation of section 269 of the Surrogates Court Act." In answering this inquiry, 172 Misc., at pp. 653, etc., he said:
"It is a matter of common knowledge that private ownership of property has been abolished in the Soviet Union, with the result that none of its nationals there resident is permitted by its laws to have the personal control of any property, which is deemed to belong solely to the State. In other words, there is here presented the precise situation contemplated in the note to the amendment to section 269 at the time of its enactment, to the remedy of which the law was passed that `transmission or payment to a beneficiary, legatee, or other person resident in a foreign country might be circumvented by confiscation in whole or in part.' So far as Russian nationals are concerned, such confiscation by and for the use of the government would be of the fund in its entirety and this is not altered by the indication in a current congressional inquiry that it would be used by the agencies of the Soviet government in this country to attempt to undermine our institutions and to sabotage our industries.
"The situation, therefore, presents an even stronger case against direct distribution, than that which existed in the Weidberg case (supra). There it was `"contingently possible" that the sums due the distributees would be subject to confiscation;' * * * here it is certain on the reiterated public statements of the responsible heads of the government of the Soviet Union themselves.
"The effect on the composite situation of the presence of the power of attorney remains for evaluation. The observation made respecting the power of attorney in the Weidberg case (supra) is equally applicable here. * * *
"This principle is an inevitable sequence of any concept of the sovereignty of an independent State. As was stated by the United States Supreme Court in The Kensington (183 U.S. 263, 269): `It is true, as a general rule, that the lex loci governs, and it is also true that the intention of the parties to a contract will be sought out and enforced. But both these elementary principles are subordinate to and qualified by the doctrine that neither by comity nor by the will of contracting parties can the public policy of a country be set at naught.' To this may be added reiterated statements of the Court of Appeals `that a court will not enforce a contract though valid where made if its enforcement is contrary to the policy of the forum' (Straus & Co., Inc., v. Canadian Pacific R. Co., 254 N.Y. 407, 414), and that `where the Legislature of the State, in which a right or privilege is claimed on the ground of comity, has by its law spoken upon the subject of the alleged right, the tribunals are not at liberty to search for the rule of decision among the doctrines of international comity, but are bound to adopt the directions laid down by the political government of their own State.' (Lemmon v. People, 20 N.Y. 562, 602. See, also, People v. Martin, 175 Id. 315, 320; Russian Reinsurance Co. v. Stoddard, 240 Id. 149, 163.)
*475 "`The power to determine what the policy of the law shall be rests with the Legislature within constitutional limitations, and when it has expressed its will and established a new policy, courts are required to give effect to such policy.' Straus & Co., Inc., v. Canadian Pacific R. Co., 254 N.Y. 407, 413; South & Central American Commercial Co., Inc., v. Panama R.R. Co., 237 Id. 287, 291).
"In the present connection, the Legislature by its enactment of chapter 343 of the Laws of 1939, amending section 269 of the Surrogates Court Act, has declared the policy of the State to be that no payment, other than to the individual distributee, shall be made from the assets of an estate, in which there appears to be a reasonable possibility that he will not receive the benefit thereof."
In the case of In re Bold's Estate, 173 N.Y. Misc. Reps. 545, 18 N.Y.S.2d 291 (1940), Surrogate Foley of New York County had under consideration the question of whether he should direct the transmission of monies payable to a distributee or whether they should be decreed to be paid into Court pursuant to the amendment to section 269 of the Surrogates Court Act. The decedent died intestate and his estate was administered by the Public Administrator. He left surviving as his sole next of kin his father, who resided in Odessa in the Union of Soviet Socialist Republics, formerly known as Russia. The distributee had executed a power of attorney in favor of an attorney at law of the Consul General of the Union of Soviet Socialist Republics who customarily represented its citizens and nationals under power of attorney in various Surrogates Courts and in which he conferred upon his attorney in fact the usual authority to appear in any proceedings and generally to represent the distributee in the collection of his share of the estate. After quoting the amendment to section 269 of the Surrogates Court Act made by Chapter 343 of the Laws of 1939 and the explanatory note appended thereto setting forth the purposes of the amendment, the Surrogate said:
"These changes in the law were brought about by actual cases arising in estates where it was demonstrated that inheritances, either testate or intestate, were, after transmission, withheld or confiscated either wholly or partially by certain countries in Europe. In certain situations these seizures were motivated by religious or racial persecutions. In other cases it was found that the beneficiary was deprived *476 of all or the greater part of the inheritance by confiscation under the guise of the imposition of excessive taxes on the right to receive the share. In other situations, it was found that confiscation was disguised under the device of payment of the transmitted share to the recipient in debased coinage or paper money of the country where he resided, whereby only a very small portion of the dollar value of the share was actually paid over."
The Surrogate found, among other things, that if the funds were ordered paid over to the attorney in fact for transmission to the distributee, he would, even under the most favorable circumstances, get the maximum equivalent of $300 in rubles and there would be confiscated by the Soviet Government the balance of $1,200; that the situation was complicated by the fact that there was no actual rate of exchange existent between the United States and the Soviet Union and that the amount which the beneficiary would actually receive would be inconsequential when compared with the value of his share in dollars. The Surrogate continued:
"The system of inheritance of our State contemplates that a beneficiary wherever situated shall be paid in full and without expropriation by a foreign country. The individual legatee or next of kin is made under our law the recipient of the inheritance. It is not intended that a foreign government, of which the beneficiary is a national, should be the object of the testator's bounty, nor that the right to succeed to the property of a New York decedent should be diverted from the statutory next of kin to a foreign power. From a selfish consideration, the State of New York might, under its inherent constitutional power, have enacted a statute which would escheat the monies in such situations to its own government under its recognized right to regulate or even withhold the privilege of inheritance. To the contrary, the amendment to section 269 of the Surrogates Court Act made in 1939 was extremely beneficial in its purpose. It contemplated no forfeiture to our State of the legacy or distributive share of the foreign beneficiary. It was intended to safeguard his rights by permitting the monies to be held until the time when it might be shown that the beneficiary, and he alone, would receive the funds" * * *.
The monies due the father of the decedent were directed to be deposited with the city treasurer to await adequate and satisfactory proof that the beneficiary will be paid his share in the fair equivalent of American dollars without confiscatory reduction or outright expropriation.
*477 In the case of In re Muckl's, 174 N.Y. Misc. Reps. 35, 19 N.Y.S.2d 1009 (1940), the Surrogate of Erie County was concerned with a bequest of $5,000 left under the decedent's will to a religious order located in Germany "to establish a permanent fund for the education of candidates for the missionary priesthood." In the course of his opinion, Surrogate Vandermeulen said:
"It is the duty of the Surrogate to see to it that the intention of the deceased is carried out insofar as he can. Under the conditions existing in Germany at this time and with the antagonism of the Hitler regime toward religious denominations it is possible that a large part of this legacy will not be used for the purpose intended by the testator should the money be sent there."
The Surrogate employed the cy pres doctrine in directing that the legacy be paid over to a branch of the religious order mentioned in the will maintained in the United States so that it could be invested more safely and assure its use for the education of candidates for the missionary priesthood in keeping with the purpose of the giving of the bequest.
See also 157 A.L.R. 121 and 34 C.J.S. p. 399.
Benedict Wolf, Esquire, of the firm of Wolf, Popper, Ross & Wolf, New York counsel for the Hungarian Acting Consul General, with whom Mr. Biro, the attorney of record in this matter, is associated, has cited to the Court in support of the position advanced on behalf of their client, the decision of Surrogate Delehanty In the matter of the Estate of Kirkor Sarkisian, published in New York Law Journal, Volume 120, No. 77, page 848, on October 20, 1948, and also referred to in an affidavit of Herbert I. Silverman submitted to this Court. So far as appears from the information furnished, the court does not appear to have there had under consideration either the statute or the cases above cited; neither do the circumstances there appear to be sufficiently comparable with those now under consideration to make the holding in that case helpful in reaching a determination in this case.
None of the cited cases affected residents of Hungary, and at the time of decision of some of those cases it is possible that a different situation with respect to an active state of war might have existed. However, these differences alone *478 do not give rise to any substantial excuse for not applying here the same principles which were there applied if, because of other circumstances, sufficient reason therefor exists. According to the terms of our statute (Rev. Stat. 3:26-18), payment into Court may be directed "where it shall appear that a legatee * * * would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment * * * be withheld." The nature of such special circumstances envisaged in the enactment of the statute is clarified by the explanatory note, which indicated that it is to be applicable "in cases where the transmission or payment to a beneficiary, legatee, or other person resident in a foreign country might be circumvented by confiscation in whole or in part" (italics supplied). The question is, therefore, not only whether the legatee would "have the benefit or use or control of the money" due it, but also, as particularly pointed out in the Weidberg and Bold cases, supra, whether it is "contingently possible" that the money due the legatee would be subject to "confiscation in whole or in part."
It is the considered opinion of this Court, based upon the circumstances hereinabove recited, particularly upon information obtained from the State Department of our Federal Government, as well as upon information which has been a matter of common knowledge, that there is not only "a reasonable possibility," but a reasonable probability that if the funds constituting the residue of this estate now remaining in the hands of the executor were delivered to the Hungarian Acting Consul General at New York, or his attorney, the legatee would not "have the benefit or use or control" thereof. In re Landau's Estate, supra. Indeed, this Court entertains great doubt as to whether the orphanage in question presently exists in fact in such manner that it can be said to be the same institution which was the object of the testator's bounty. It is, therefore, doubtful whether the executor can now distribute the residue of the estate "in accordance with the last will and testament of the decedent, John Url," as directed in the judgment allowing the executor's *479 account. With respect to the possibility that "the transmission or payment to * * * (the) legatee * * * might be circumvented by confiscation in whole or in part," it appears sufficient to refer to the report received from the Department of State under date of June 7, 1949, in which it was pointed out, among other things, that "the present dollar exchange rate arbitrarily fixed by the Hungarian Government (which is from one-fourth to one-sixth of the real purchasing value of the dollar) and existing Hungarian foreign exchange regulations, would cause from three-fourths to five-sixths of the total amount of these funds to be diverted from the orphanage to other uses of the Hungarian Government, if that Government presently receives these funds." It is obvious from this that if the executor should presently pay the residuary estate over to the Hungarian Acting Consul General for transmission to the legatee (assuming the legatee to exist), it "would not have the benefit or use or control of the money" and that "the transmission or payment to * * * (the) legatee * * * (would) be circumvented by confiscation in whole or in part," since the legatee would apparently receive only some amount between approximately $8,700 and $13,000, instead of $52,000, and that from $39,000 to $43,000 would be diverted to uses of the Hungarian Government. "It is not intended that a foreign government, of which the beneficiary is a national, should be the object of the testator's bounty." In re Bold's Estate, supra. It is the duty of both the executor of the estate and of this Court to prevent such a result from becoming an accomplished fact contrary to the intentions of, and the public policy expressed by the Legislature in the enactment of P.L. 1940, c. 148 (N.J.S.A. 3:26-18). In re Weidberg's Estate, supra, and In re Landau's Estate, supra. It is apparent from the foregoing that there are present in this case the "three premises" mentioned in In re Blasi's Estate, supra, upon which must be predicated the direction by the Court to the executor to pay the funds into Court under Rev. Stat. 3:26-18.
This Court will entertain the making and entry of a judgment directing the executor of the above named estate to *480 pay over the residue of the estate remaining in his hands to the Surrogate, as the Clerk of this Court, for the benefit of such legatee, next of kin, or such person or persons who may hereafter appear to be entitled thereto, and to be paid out only by the special order of the Court at such future time as it can be determined, by adequate proof, either that the orphanage which was the object of the testator's bounty continues to exist and function in such manner that it would have the benefit, use and control of the funds for the accomplishment of the purposes apparently intended by the testator and that such funds could be transmitted to it without confiscation or substantial diminution, or, that the said orphanage no longer exists and functions in such manner and that, therefore, other disposition of the funds should be made. The question of when in the future application may be made to the Court for a special order directing the final payment and distribution of the funds will, of course, have to await future developments. It now seems reasonable to suggest that if, after the lapse of a reasonable period of time, to be determined by all of the intervening occurrences, it is found by satisfactory proof, either that the orphanage does not exist, or that satisfactory independent proof cannot be obtained as to whether it exists, then perhaps the Court should at that time consider and determine those issues which have been herein raised but not determined, viz.: whether the cy pres doctrine should be applied; whether the residuary bequest has lapsed, and whether there is an intestacy with respect to the residue entitling the next of kin to the distribution thereof.
The judgment to be presented may also contain a provision directing the Surrogate to invest the funds ordered paid over to him in securities approved by the laws of the State of New Jersey for the investment of trust funds, to be approved by order of the Court prior to the actual making of such investments.
In accordance with the conclusions hereinbefore expressed, there has already been made and entered a judgment admitting the next of kin of John Url, deceased, as parties defendant *481 and denying the motion by the attorney for the Hungarian Acting Consul General to strike from the records all pleadings and other documents filed herein on behalf of the next of kin.
There now remains for consideration only the question of allowances to counsel for services rendered in these proceedings. Each of the counsel involved have applied to the Court for allowances, as has also the executor, who is a member of the Bar of the State of New York. Inasmuch as Mr. Biro has not heretofore been allowed any counsel fee for his services in the matter of this estate, the Court will at this time grant him an allowance intended to compensate him for all services rendered by him up to the present time. Notwithstanding that extraordinary services rendered by him might well merit an additional allowance, since the executor has already been allowed full executor's commissions and is not a member of the Bar of this State engaged in the practice of law and maintaining an office in this State, no allowance can be made for any legal services rendered by him in this proceeding. (P.L. 1939, c. 140; N.J.S.A. 2:20-9.) In fixing the allowances, consideration has been given not only to the actual work performed by the respective counsel, but also to the extent that their services may have been helpful to the Court in reaching a determination. The judgment to be presented may include the following allowances: to Ernest P. Biro, $2,000; to Bowers & Rinehart, in addition to counsel fees granted on the allowance of the executor's account, $1,000, and to Brunetto & Welsh, $1,000. The counsel fees so allowed may be paid by the executor prior to paying the balance of the residuary estate into Court and the judgment may so provide.