84 N.J. Super. 485 (1964)
202 A.2d 709
MOST REVEREND VINCENT BRIZGYS, AUXILIARY BISHOP OF THE ROMAN CATHOLIC METROPOLITAN ARCHDIOCESE OF KAUNAS, LITHUANIA, PLAINTIFF-RESPONDENT,
v.
THE COUNTY TREASURER OF UNION COUNTY, NEW JERSEY, DEFENDANT, AND PAULINE STYLER AND PETRONELLA PADAGAS SCANLON, IMPLEADED DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Considered June 22, 1964.
Decided July 14, 1964.
*488 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. Joseph C. Monico, attorney for impleaded defendants-appellants (Mr. Sam Weiss, of counsel, argued the cause on appeal).
Mr. Richard J. Tarrant, attorney for respondent.
Mr. Arthur J. Sills, Attorney General (Mr. James S. Oliver, Law Assistant, of counsel).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This appeal involves the distribution to a beneficiary behind the Iron Curtain of estate funds now held by the Union County Treasurer and claimed by plaintiff and the impleaded defendants (hereinafter defendants), respectively.
When the matter was last before us in March 1964 we remanded it to the trial court for the taking of testimony as to the continued existence and functioning of the beneficiary, the Roman Catholic Church in Vevirzenai, Lithuania. We did this upon the representation of plaintiff's counsel that there were two witnesses, now available, who were in Vevirzenai in 1963 and could testify as to the viable existence of the church. We retained jurisdiction, directing that prompt notice be given the Attorney General so that he might, if he so desired, participate in the supplemental proceedings and in this appeal.
The supplemental record is now before us, together with plaintiff's and defendants' supplemental briefs. The Attorney General, who had not been joined as a party or notified of the proceedings before our remand, participated in the supplemental hearing and has filed a brief dealing with all issues heretofore raised.

*489 I.
Antanas Andrejeuski, a Union County resident, died June 21, 1941, leaving a last will duly admitted to probate by the surrogate. The will, executed in 1933, bequeathed $500 to a niece, defendant Pauline Styler, and $700 to another niece, defendant Petronella Padagas (Scanlon). In addition, there were small bequests to decedent's godfather, a Catholic church and a Catholic society, all of this country, as well as to a brother and his children, and to a sister, all residing in Lithuania. Paragraph 10 of the will bequeathed $10,000 to "The Roman Catholic Church, Vevirzona, Lithuania." By paragraph 11, testator left the rest, residue and remainder of his estate to that church, stating that "it is my wish that the said Church shall in its discretion use the said residue for the benefit of poor people."
The beneficiaries residing in this country, including defendants, were paid their legacies in full and signed receipts therefor. However, the Lithuanian nationals, including the Vevirzenai church, did not receive their legacies because of World War II. By order of the then Union County Orphan's Court, dated June 23, 1943, the executor was directed to pay the balance remaining in his hands ($19,732.27) to the surrogate as clerk of the court, "for the benefit of the Lithuanian Nationals."
On January 24, 1949 Jonas Budrys, the Consul General of Lithuania at New York, applied to the Union County Court, Probate Division, on behalf of the Lithuanian nationals, requesting that the surrogate pay over to him the monies deposited with him. The consul was represented by plaintiff's present attorney. Defendants filed an answer objecting to the payment. The County Court dismissed the complaint without prejudice, on the ground that plaintiff had failed to sustain the burden of proof as to his right and title to the monies.
The fund remained with the surrogate until October 9, 1959, when the Chancery Division, upon application of the *490 county attorney, directed that it be paid over to the county treasurer as "unclaimed monies" for the general use of the county, pursuant to N.J.S.A. 40:26A-1 et seq.
Plaintiff instituted the present action in March 1963. The complaint alleged that he was the duly authorized representative of the Roman Catholic Archdiocese of Kaunas, Lithuania, with full power to act not only in Lithuania but in the United States with respect to all property rights and matters affecting the Roman Catholic churches in that diocese, as evidenced by a certificate of the Secretary of State of His Holiness in Vatican City, dated November 17, 1962. After reciting the Union County proceedings above referred to, the complaint went on to state that the federal Office of Alien Property, pursuant to application duly made, had on May 25, 1950 issued a license to Richard J. Tarrant (plaintiff's present attorney), "as attorney for Dr. Joseph Skvireckas, Metropolitan Archbishop of Kaunas in Lithuania," unblocking the distributive share of the Vevirzenai church. (Metropolitan Archbishop Skvireckas has since died and plaintiff has succeeded to his powers.) The complaint also alleged that the Vevirzenai church, known as St. Matthews Roman Catholic Church, was in existence when the testator died in 1941 and is in existence today. Plaintiff demanded judgment directing the Union County Treasurer to pay him, as the duly authorized representative of the Roman Catholic Church in Lithuania, the entire fund on deposit with him under the 1959 County Court order, then amounting to $25,163.13, less whatever sums were due the individual Lithuanian nationals.
Following the filing of the complaint an order issued directing the county treasurer to show cause why the requested judgment should not be granted. No notice was given any of testator's next of kin or the Attorney General. The Chancery Division judge then took the testimony of Reverend Rackauskas and Reverend Jankus, two Roman Catholic clergymen, as well as that of plaintiff. At the conclusion *491 of the hearing the judge suggested that formal notice be given the next of kin of the application for entry of judgment in plaintiff's favor. An order issued that defendants Styler and Scanlon show cause why the judgment should not be granted. They responded to that order, and the matter was argued at some length. Defendants maintained there was no clear proof of the existence of the church or that the funds could safely be transmitted. Because they had not been represented at the original hearing, they reserved their objections to all hearsay evidence introduced at that time. On June 11, 1963 the trial judge directed the county treasurer to pay plaintiff the sum of $22,163.13 of the fund on deposit with him as "unclaimed monies" of the estate. The order was stayed for 20 days to permit the taking of an appeal. We continued the stay pending determination.
In directing that the monies be paid over to plaintiff, the trial judge stated he was satisfied from the testimony, "even with its necessary shortcomings," that the Vevirzenai church was still functioning. As to whether the funds would reach the objectives which testator intended, the judge was of the opinion that "to pay the funds into the hands of the Archdiocese in which this particular parish is located is a practical way of paying the fund without facing the problem of international transmittal through bank channels or postal channels." He accepted as "reasonably satisfactory" plaintiff's testimony that "there are established channels within the church organization by which, without relying upon postal channels and international banking channels, the funds can be sent to and applied to and used for the benefit of the objectives in the parish which the testator wanted to benefit."
When the appeal was originally before us defendants argued that (1) there was no proof of plaintiff's authority, as Auxiliary Bishop of the Kaunas Archdiocese, to administer the funds in question or to receive them from our courts; (2) plaintiff had failed to prove the present existence of the Vevirzenai church or that the money bequeathed by testator *492 would reach the ultimate beneficiaries; (3) a letter from the Department of State, hereinafter mentioned, should have been excluded from evidence as hearsay; (4) the cy pres doctrine is inapplicable here; and (5) defendants, as next of kin, are entitled to share in the funds as lapsed legacies. We did not pass upon any of these contentions; rather, upon the representation of plaintiff's counsel as to the availability of witnesses who had been in Vevirzenai in 1963, we remanded the matter for the taking of their testimony.

II.
We first address ourselves to a motion made early in the appeal that defendants had no right, vested, contingent or otherwise, to the bequests so as to make them parties aggrieved by the order under consideration. We denied the motion, but plaintiff presently renews that argument.
There is little doubt that the Vevirzenai church was in existence when testator died and his will was probated in 1941. This is clear from the testimony of Reverend Rackauskas, Reverend Jankus and plaintiff. At that time the church gained a vested right to the legacies which, however, were not paid because of World War II. Absent a lapse, defendants have no interest in the monies left to the church. However, if the Chancery Division order is permitted to stand unchallenged, they will have lost all chance to prove later on that a lapse actually occurred. The result would be a denial of their day in court and a miscarriage of justice. Defendant should not be foreclosed from showing that a lapse has occurred. In re Url, 7 N.J. Super. 455, 466 (Cty. Ct. 1950), appeal dismissed 5 N.J. 507 (1950). Compare In re Lent, 142 N.J. Eq. 21 (E. & A. 1948).

III.
We find no merit in defendants' contention that plaintiff was without authority to receive the funds in question *493 from our courts and to administer them. His authority is attested by the certificate issued from the Vatican on November 17, 1962 over the signature of the Secretary of State, Cardinal Cicognani, which reads that plaintiff, "Auxiliary Bishop of the Catholic Archdiocese of Kaunas in Lithuania, has full authority and jurisdiction to handle the affairs of the aforesaid Archdiocese of Kaunas, and possesses full power of attorney to the extent required by the civil law of the United States of America for the effective transfer of funds bequeathed in fee simple or in fee tail [sic] to the Roman Catholic Church in Lithuania." Further, the Department of Justice, Office of Alien Property, had, as noted, issued a license in May 1950 to plaintiff's present attorney, then representing plaintiff's predecessor in office, which authorized the monies in question to be regarded as funds in which no blocked country or national had an interest.

IV.
We deal briefly with the introduction in evidence of a letter from the Department of State, dated April 17, 1963, addressed to plaintiff's counsel and signed by the "Assistant to Legal Advisor for European Affairs." This was in reply to the attorney's letter concerning the present action to secure an order directing the county treasurer to turn over the monies bequeathed to the Vevirzenai church. In pertinent part it reads:
"The Department of State perceives no objection from a foreign policy standpoint to the release of the funds to the Most Reverend Vincent Brizgys should such release appear to be the proper course of action to the Superior Court of New Jersey."
The letter would appear to fit no recognizable exception to the hearsay rule. However, the instant case obviously presents unique problems. Although not a public record of the United States Department of State, the letter bears the indicia of *494 reliability. We find no prejudicial abuse of discretion in its admission.

V.
Defendants' primary contentions go to the insufficiency of the evidence to support the determinations of the trial court that the church in Vevirzenai exists and that the bequest will reach the ultimate beneficiaries. The controlling statute is N.J.S. 3A:25-10, which provides in part:
"Where it shall appear that a legatee, next of kin or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld, the court to which the fiduciary is accountable, * * * may direct that such money or other property be paid into such court for the benefit of such legatee, next of kin, beneficiary of a trust, or such person or persons who may thereafter appear to be entitled thereto. * * *"
The testimony given at the original hearing regarding the continued existence and functioning of the Vevirzenai church was not satisfactory. None of the three witnesses had been in Lithuania since October 1944. Reverend Rackauskas said he knew the church existed because "almost every month correspondence come from the Pastor," Reverend Beinoris. This was hearsay. So with the testimony of Reverend Jankus, presently serving with the Lithuanian Relief Fund, an agency which sends parcels to Lithuania and to needy Lithuanian nationals anywhere in the world. When asked what evidence he had that the Vevirzenai church still existed his answer was, "Oh, plenty. * * * Some people came. For instance, one lady lives in Brooklyn. She came last year."
As for plaintiff, he based his knowledge of the present existence of the church on the fact that when he attended the first session of the Ecumenical Council in Rome in December 1962 he met three Lithuanian priests who had a privately printed directory of churches in their possession. He checked this list to determine which churches were still in existence. *495 The priests had told him that the church in Vevirzenai was open and functioning.
Although all the testimony just described was hearsay, the county attorney, appearing for the only defendant then in the cause, raised no objection.
At the hearing on remand there were introduced in evidence two photographs which all witnesses agreed represented the Vevirzenai church. Reverend Rackauskas said that he had received the smaller of the two pictures (the other being merely an enlargement), together with a letter from Reverend Dinarige of Vevirzenai in September 1963. Obviously, it cannot be inferred that the picture was taken just before it was sent, and there is no evidence to show just when it was taken. However, there is direct evidence to prove that it was taken after 1944 because it shows, in addition to the original church, an adjoining building which was not in existence at the time Reverend Rackauskas left Lithuania in 1944.
Plaintiff offered the testimony of Antanas Gailius and his wife at the supplemental hearing. Contrary to counsel's representation at oral argument, neither had been in Vevirzenai in 1963, both having left Lithuania in 1960. However, they gave some evidence, not previously available, as to the existence of the church. Antanas said that he had travelled from his home in Andrayavas to Vevirzenai, about eight miles away, and had passed the church. He could not recall the exact year, but remembered it was "when the Russians came the second time." The wife testified that her husband had gone to Vevirzenai about two years before they left the country.
We are satisfied that the church physically existed at least as late as 1958. The question remains, was the church a functioning one? Of this we still lack direct proof. However, there is satisfactory circumstantial evidence of that fact. Mrs. Gailius testified that she often saw the priest from Vevirzenai visiting the pastor of her church in Andrayavas. Reverend Rackauskas and plaintiff had testified at the earlier *496 hearing about their regular letter communication with the Vevirzenai priest.
Since our obvious concern is as to whether the Russian Government had suppressed religious activities in Lithuania, the testimony of the Gailiuses about the exercise of religion in their parish is significant. They both said they were able to attend church regularly in Andrayavas, the only indication of government interference being that certain restrictions prevented the younger people from going to church on work days. Sunday services were relatively well attended.
In addition to the testimony of the Gailiuses and such non-hearsay proofs as were presented, we have the presumption in favor of the continued life of the church. Plaintiff, of course, had the burden of proof of establishing that there was a viable church in Vevirzenai; it was not defendants' task to prove the contrary. However, it should be noted that defendants produced no evidence that even suggests there is no functioning church in Vevirzenai; in fact, they stated they had no affirmative evidence. At best, they suggest that the Russian Government, being anti-religious, has put a quietus on all church activities within the Soviet orbit. We know this is not so. The Catholic Church continues in Poland, for example, and throughout Russia, unless we are to disregard all news accounts and dispatches. In this case we have proof from Mr. and Mrs. Gailius that the church in Andrayavas continues, and there is enough to convince us that the Vevirzenai church also functions.
Considering the entire record, we are satisfied that there is sufficient evidence to support the Chancery Division's finding that the church in Vevirzenai continues to exist.

VI.
We next deal with the question of whether the funds in question may safely be transmitted to the church in Vevirzenai. We find plaintiff's proofs on this branch of the case unsatisfactory.
*497 The first witness, Reverend Rackauskas, said that he sent packages and knew they were received because "I got letters." However, the packages were sent through "Parcels to Russia, Inc.," which he said was an agency of the Russian Government..
Reverend Jankus said that the Lithuanian Relief Fund sent packages in various ways. Some went through the agency (Parcels for Russia, Inc.?) and some items, like medicines, were entrusted to persons visiting Lithuania. He also testified that money was transmitted  "There are special agencies they do." Asked whether he had evidence that the money was received, his answer was "Yes." Neither plaintiff's counsel nor the county attorney developed just what the "special agencies" were and what the evidence of the receipt of the money was. When the witness was asked on cross-examination if he could designate the special channels used, he said "Some of them I could mention you, but some of them I can't." He admitted there was always danger that the Russian Government would confiscate the money if a large amount was sent.
When plaintiff took the stand he was asked on direct examination how he intended to transfer the money in question. He said he would write the Chancery Office of the Kaunas diocese "to pay to such church or to such person such and such amounts of money" from the funds of that office. He went on to say:
"* * * Now, to reverse, the Chancery office from the funds which I have in my possession and I have in America, I do use certain occasions the means, by various means, and I have on occasion  the last one was last summer when I advanced a couple of thousand dollars to other Chancery office of Lithuania, not particularly for Kaunas. So I have no difficulties of such transactions. * * *"
He had last done this in December 1962, in the amount of $5,000. When asked how he knew that the money had been received, he gave the hearsay answer, "From the letters sent to me by the administrator of the diocese." The Russian *498 Government, he testified, did not get the money because it was paid directly from hand to hand. On cross-examination he said that there was risk of the Russian Government confiscating funds if they were sent directly through an American bank, and the offices of the Lithuanian Embassy in Washington and the Consul General in New York were not available. In answer to a specific question as to who would be responsible for the disposition of monies transmitted in the way he had described, his answer was that a Reverend Stankevicius, in charge of the Chancery Office in Kaunas, would administer the funds, and these would be kept in cash in a safe.
Although plaintiff, by designation of the Vatican, has been given authority to handle the affairs of the Archdiocese of Kaunas and has full power of attorney for "the effective transfer of funds bequeathed * * * to the Roman Catholic Church in Lithuania," it should not be overlooked that the bequests here are not to the archdiocese, or its American representative, but to the church in Vevirzenai. It is that church which was the object of the testator's beneficence. The bequests to the church, both the $10,000 as well as the residue given it with the precatory provision that it shall "in its discretion, use the said residue for the benefit of poor people," are stamped with a charitable purpose. It is the obligation of our courts, under the statute (N.J.S. 3A:25-10) to make sure that funds left to an individual or institution behind the Iron Curtain can safely be transmitted to the beneficiary. There must be convincing proof that the distributive shares will reach their proper destination. We may not turn away from the common knowledge of obstacles which stand in the way of that desired achievement. In re Url, above, 7 N.J. Super. 455 (Cty. Ct. 1950); In re Volencki, 35 N.J. Super. 351 (Cty. Ct. 1955); In re Markewitsh, 62 N.J. Super. 407 (Cty. Ct. 1960).
That there is a continuing concern in official circles that money cannot safely be transmitted to Iron Curtain territory is reflected in the regulation of the Secretary of the *499 Treasury, 31 Code of Federal Regulations, § 211.3(a) (Supp. 1962), which provides
"The Secretary of the Treasury hereby determines that postal, transportation or banking facilities in general or local conditions in Albania, Bulgaria, Communist-controlled China, Czechoslovakia, Estonia, Hungary, Latvia, Lithuania, the Union of Soviet Socialist Republics, the Russion Zone of Occupation Germany, and the Russian Sector of Occupation Berlin, Germany, are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value." (Italics added)
Although subsection (b) of the regulation does provide that a check or warrant drawn against blocked funds may be released if a license authorizing such release is first issued by the Office of Alien Property, Department of Justice, the clear warning of (a) may not be ignored.
It is argued that the funds here are not being transmitted in the manner indicated by the Secretary of the Treasury regulation  that we are concerned with private funds passing through private channels. We find the distinction unimportant. As was said in In re Wells' Estate, 204 Misc. 975, 126 N.Y.S.2d 441 (Surr. Ct. 1953), the important factor is whether there is a reasonable assurance that the distributee will actually receive the monies to which it is entitled. And see In re Markewitsh, above, 62 N.J. Super., at pages 409, 411; State v. Pekarek, 234 Ore. 74, 378 P.2d 734, 737-8 (Sup. Ct. 1963).
The fact that the Department of State, through its Assistant to the Legal Advisor for European Affairs, has written plaintiff's attorney that the Department "perceives no objection from a foreign policy standpoint" (italics ours) to the release of the funds to plaintiff, does not weigh in plaintiff's favor, for the letter goes on to say: "should such release appear to be the proper course of action to the Superior Court of New Jersey." This letter can hardly be characterized as a *500 reliable assurance, at least until the Secretary of the Treasury reverses the determination expressed in his regulation.
We pay proper respect to the fact that the intentions of plaintiff, as auxiliary bishop, are completely sincere and correctly motivated. We also recognize that, unlike the situation in some of the cases cited above and in defendants' brief, the person seeking control and administration of the funds now in the county treasurer's hands is before the court. He must rely upon extra-official, subterranean channels  a private banking system  to transfer funds from his headquarters in Chicago to Lithuania. Whether they will ever reach, in part or in whole, the true beneficiary, the Vevirzenai church, and (if testator's wish is carried out) the poor of the Vevirzenai parish, is conjectural under the present circumstances. We cannot proceed on the assumption that the underground channels of transmission testified to by plaintiff constitute a reliable source of assurance that the monies can safely be forwarded to Vevirzenai. We must have more convincing proof than the record exhibits.

VII.
Defendants urge that the funds in question are not subject to the cy pres doctrine, and that as next of kin they are entitled to share in them as lapsed legacies. These matters were not in issue in the court below. Being of the opinion that the Vevirzenai church was a viable entity and that the proofs were "reasonably satisfactory" that the funds could be transmitted safely, the trial judge was not called upon to pass on the application of the cy pres doctrine or whether the legacies had truly lapsed.
In our view the funds should be redeposited with the Union County Court, there to be held for the benefit of the church in Vevirzenai. Application for distribution to the beneficiary may be renewed when it appears probable that local conditions in the Union of Soviet Socialist Republics indicate that there *501 is a reasonable assurance that the beneficiary will have the benefit or control of the monies due.
We recognize that more than 20 years have passed since testator's death. We also recognize that there has been a degree of relaxation in the economic arrangements between the U.S.S.R. and the United States, and that it is not entirely improbable that the Russian Government may in the not too distant future permit the transfer of monies through official channels. In the alternative, plaintiff may in the near future be able to prove, in a much more definite way than he has in the present action, that money can be transmitted in such manner as to give our courts positive assurance that it will reach the intended beneficiary, without confiscation or other diversion.
The order under appeal is reversed with direction to the Chancery Division to enter an order directing the Union County Treasurer to transfer the fund in question, with all accumulated interest, to the Union County Surrogate as clerk of the court.