In the Matter of the Accounting of DEZSO DOBO et al., as Executors of GABRIEL WELLS, Deceased.

Surrogate's Court, New York County, December 7, 1953.

*John Patrick Walsh* and *Ben Herzberg* for executors, petitioners.

*Paul L. Ross* for Karel Brus, as Charge d'Affaires, Czechoslovak Embassy, Washington, D. C., on behalf of Istvan Szekac, and another, respondents.

*Smith, Sargent, Doman & Grant* for Nicholas R. Doman, respondent.

*Nathaniel L. Goldstein, Attorney-General* (*Julius Greenfield* of counsel), in his statutory capacity under section 12 of Personal Property Law and section 113 of Real Property Law, respondent.

COLLINS, S. The principal question in this contested accounting proceeding is whether funds should be transmitted to beneficiaries residing in Czechoslovakia and Hungary, or should be retained under the jurisdiction of this court for their benefit.

The testator, a resident and citizen of this State, died on November 6, 1946. His will was admitted to probate in this court on January 6, 1947. The existence of certain nonliquid assets requires that the administration of the estate be kept open. However, substantial distributions of assets have been made to all beneficiaries, except Istvan Szekac, residing in Czechoslovakia, and Erzsi Schmiedl, residing in Hungary. These two beneficiaries received only small payments very early in the administration, and have not received any further payments on account of their legacies.

The foreign beneficiaries are given legacies in the will and, as statutory distributees, they share in property not effectively disposed of by the will. (See *Matter of Wells,* N. Y. L. J., Oct. 24, 1949, p. 958, col. 6.) The will makes provision for subtracting from some legacies a part of certain debts owed the testator and for the addition of such amounts to other shares. Under the

will as construed by the court, the Czechoslovakian national is entitled to a one-fifth share of the residuary estate and to 8% as an intestate distributee, less debts deducted pursuant to the prior decree herein. His share, after deduction of estate taxes, will exceed $90,000. The Hungarian beneficiary is entitled to a cash legacy of $2,500 and 8% of the net estate as a distributee, plus a proportionate share of the debts deducted from other shares. Her share will amount to more than $33,000.

In this accounting proceeding the executors allege that Istvan Szekac and Erzsi Schmiedl would not have the benefit, use or control of any further payments made to them, and they ask that, for the protection of the beneficiaries, they be permitted to withhold further payment to them at this time. The Chief of the Consular Section of the Legation of the Hungarian People's Republic has appeared on behalf of Erzsi Schmiedl and the Charge d'Affaires in charge of Consular functions of the Czechoslavak Embassy claims to represent Istvan Szekac. Both officers appear by the same counsel. They deny the material allegations of the petition relating to enjoyment of the benefit, use and control of the property, and they demand that the shares of their nationals be forwarded to the beneficiaries through their respective consular representatives. The court directed a hearing of the issue of fact so created.

Since the administration of the estate must continue for some time, the executors ask that they be permitted to hold the funds rather than to deposit them in court as directed in section 269 of the Surrogate's Court Act. All parties recognize that in other respects section 269 applies and that it prescribes the conditions under which moneys or property may be retained by the accounting parties or paid into court.

Section 269, insofar as material, reads: "Where it shall appear that a legatee, distributee or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld, the decree may direct that such money or other property be paid into the surrogate's court for the benefit of such legatee, distributee, beneficiary of a trust or such person or persons who may thereafter appear to be entitled thereto." This is not a punitive statute nor a retaliatory measure. It does not divest the beneficiary of any part of his inheritance or deprive him of its use or enjoyment. On the contrary, its aim is to protect the interests of the beneficiary, to guard and preserve his inheritance until he is able freely and fully to enjoy and use

it, and to defend it against the efforts of foreign governments either to seize it forcibly or to drain it off gradually through a variety of devices and practices. Protection of the beneficiary is emphasized both in the legislative documents relating to the enactment of the statute and in the judicial decisions construing it.

Remedial legislation became necessary when the courts supervising estate administrations found that inheritances transmitted to certain countries in Europe were withheld from the beneficiaries or confiscated in whole or in part. The devices used to deprive beneficiaries of the funds were numerous and varied even in the beginning (see *Matter of Bold,* 173 Misc. 545, 547), and they continue to assume ever differing forms. The Legislature acted to prevent not only overt seizure of entire legacies but every kind of confiscation of an inheritance in whole or part, no matter how such efforts are disguised. The explanatory note printed in the legislative bill states that the " purpose of the amendment is to authorize the deposit of monies or property in the Surrogate's Court in cases where transmission or payment to a beneficiary, legatee, or other person resident in a foreign country might be circumvented by confiscation in whole or in part. The amendment authorizes the *impounding* of the fund by the Surrogate to await the time when payment can be made to the beneficiary for his own benefit, use and control."

There is no provision in the statute for the escheat of these funds to the State of New York or for their distribution to other persons. " From a selfish consideration, the State of New York might, under its inherent constitutional power, have enacted a statute which would escheat the moneys in such situations to its own government under its recognized right to regulate or even withhold the privilege of inheritance. To the contrary, the amendment to section 269 of the Surrogate's Court Act made in 1939 was extremely beneficial in its purpose. It contemplated no forfeiture to our State of the legacy or distributive share of the foreign beneficiary. It was intended to safeguard his rights by permitting the moneys to be held until the time when it might be shown that the beneficiary, and he alone, would receive the funds." (*Matter of Bold,* 173 Misc. 545, 551; see, also, *Matter of Weidberg,* 172 Misc. 524, 528.) The moneys when deposited in court remain the property of the beneficiary. The statute takes nothing from the beneficiary because the suspension of transmission is temporary, not permanent. " This deprives him of no right, since the money is

always available to him and is his for the asking at any time that reasonable assurance is forthcoming that he, and he alone, will get it. This statute, far from constituting an impairment of his rights, was designed as and in fact is, a potent protector thereof." (*Matter of Weidberg, supra,* 531; *Matter of Braier,* 305 N. Y. 148, 158.)

The consular representatives argue that the proof offered by the executors deals mainly with past events rather than with the use and enjoyment of property in these countries in the present and in the future. They contend that the quality of the proof is insufficient to justify withholding the funds and that unless the executors clearly establish that the beneficiaries cannot enjoy and use the funds, the decree must direct transmission.

If this court had available to it any means of supervising the payment of funds to nationals of these countries and for assuring itself of the beneficiary's ability to hold and enjoy it, the issue would be capable of ready solution. In this case neither beneficiary has personally made any request for the funds. This circumstance does not present any insuperable obstacle, for the court entertains no doubt that if a personal request were insisted upon, it would normally be produced no matter how painful to the beneficiary such a request might prove. We advert to the fact only to emphasize the problem in this type of case, for ordinarily a beneficiary who, of his own free act and will, desires transmission of such large sums as these, would not lack means of assuring this court that he could use, control and enjoy the money if such were the fact. The greatest difficulty in cases such as this arises from the fact that there can be no free interchange of views between executor and legatee and no opportunity for free investigation by the executors of conditions at the legatee's domicile. From behind the curtain comes only such information as the foreign government will permit. Therefore, we must rely chiefly on what former residents of those countries tell us about conditions there and such other events as necessarily come to the public attention.

The executors' proof starts with a finding of fact made by the Secretary of the Treasury of the United States. The Federal Government and its agencies would, in the normal course of events, have sources of information not available to private individuals. The official determination reads as follows: " The Secretary of the Treasury hereby determines that postal, transportation, or banking facilities in general or local conditions in * * * Czechoslovakia [and] * * * Hungary * * *

are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and *be able to negotiate the same for full value.*" (16 Federal Register 1818, Treasury Department Circular, 1951, No. 655, Supp. 7. Emphasis added.) This determination has received serious consideration in the courts, and where no countervailing evidence is produced, it has sufficed to make it appear that a legatee would not have the benefit, use or control of the money. (*Matter of Braier,* 305 N. Y. 148; *Matter of Geffen,* 199 Misc. 756; *Matter of Thomae,* 199 Misc. 940; *Matter of Best,* 200 Misc. 332; *Matter of Getream,* 200 Misc. 545; *Matter of Yee Yoke Ban,* 200 Misc. 499.)

Neither the Consular Section of the Legation of the Hungarian People's Republic nor the Charge d'Affaires of the Czechoslovak Embassy offers to this court any real basis for assurance that the beneficiary will be able to use and enjoy the inheritance. Counsel have stipulated that if the two consular representatives were called as witnesses, each would testify that his national would receive his or her share of this estate, free of taxes and without any deductions, except the ordinary expenses of attorneys' fees, usual consular handling charge, and nominal bank charges. The Charge d'Affaires would testify that the Czech national would receive his share in kronen at the rate of exchange established in that country of 50 kronen to the dollar (old currency). The Chief of the Consular Section of the Hungarian Legation would testify that his national would be paid in forints at the Hungarian rate of exchange of 11.8640 forints to the dollar.

The executors contend that such rates of exchange do not permit the legatees to obtain full value for their legacies. A witness of long experience in the foreign exchange market testified that the free rate of Czech kronen (old currency) was approximately 300 to the dollar — as opposed to 50 at the official rate — and for Hungarian forints was approximately 40 to the dollar — as opposed to 11 and a fraction at the official rate. This vast difference in exchange rates, it is argued, makes the foreign governments the principal legatees. This loss to the legatees, great as it might appear, is not, however, the most serious one.

A former Czechoslovakian attorney testified that essential foods and clothing were rationed in that country and were available within the limit of the ration at fixed prices. There was also an established free market where one could purchase

unlimited quantities of rationed articles as well as other goods not sold in the rationed market. The prices were very much higher in the free market. A worker would purchase essentials in the rationed market up to the limit prescribed for his family but, because his ration was usually less than his wages could buy, he must spend the balance of his wages in the free market at the higher scale of prices. Persons receiving an inheritance could spend such money only in the free market, he testified, because even if he were a worker, his full ration would be absorbed by an amount less than his wages. If he is not employable, he would not have any ration and could buy only in the free market. Under this philosophy of government, inherited wealth, even when it can be retained and spent, is drained off under such discriminatory practices.

Moreover, there is no assurance that the legatees could retain and use the funds even under such handicaps. The recent action taken by the Government of Czechoslovakia to revalue its currency is very significant. As of June 1, 1953, wages, salaries and other rewards for work and services, as well as prices, taxes and sums payable, were readjusted at the rate of 5 kronen in the old currency to 1 krone in the new currency. This rate of adjustment is not, however, applicable to all moneys held by an individual. Persons " who do not employ hired labor and who were not excluded from rations from the regulated market " and members of the family of such persons could exchange a maximum of 300 kronen per person of old currency at this ratio of 5 to 1. Cash exceeding that amount could be exchanged at the rate of 50 kronen of old currency for 1 krone new currency. All other citizens could exchange funds only at the 50 to 1 rate. Cash held by economic, financial or other organizations and institutions could be exchanged only at the 50 to 1 rate. With respect to deposits in State savings banks or the State bank, a graduated ratio prevailed. Deposits on savings books of workers, paying in regular savings in work groups were exchanged at the 5 to 1 ratio. Other deposits up to 5,000 kronen were exchangeable at the same rate. In deposits exceeding 5,000 kronen, the amounts over 5,000 kronen would be exchanged as follows: 5,000 to 10,000 at 6.25 to 1; 10,000 to 20,000 at 10 to 1; 20,000 to 50,000 at 25 to 1; over 50,000 at 30 to 1. Current accounts of private persons into which sums were paid for the sale or lease of movable or immovable property or for rent for houses or apartments fall into the 50 to 1 ratio. State bonds issued after 1945 and bonds and mortgages

issued after that date are invalidated. Old currency which is not exchanged by a fixed date becomes void.

The Charge d'Affaires of the Czechoslovak Embassy offered in evidence the address made by the Prime Minister to the National Assembly upon the introduction of the Currency Reform Act. Most of it is irrelevant to the questions here. Such of it as is relevant only serves to make more clear the plight of one who might have received such a legacy as this $90,000 legacy exchanged in kronen at the old official rate. In this address, it was said that the rationing system would be abolished in connection with the currency reform. The supply of goods to the workers would be insured, it was stated, according to the principle, " To everybody according to the quantity and quality of work done." Uniform retail prices would be higher in some cases than the previous prices for rationed goods and accordingly there was a promise that basic wage scales, salaries and family allowances would be increased. But what of the person who had managed to retain some of the funds inherited from a relative here? The sole promise to him seems to be this: " The principles on which the exchange is based bear heavily upon capitalist elements and speculators and considerably lessen their accumulated ready money. There is no ground for doubt that the results of this measure will be profound in the struggle against these elements."

If a legatee or distributee kept his inheritance in cash, he could exchange the equivalent of $6 at the worker's rate and the balance only at a confiscatory rate. If he deposited it in a savings account (assuming that he could do so) the major part of it would be exchangeable only at a confiscatory rate. If he invested any part of it in Government bonds, he would lose it.

Moreover, such losses would accrue to the beneficiary on the assumption that funds transmitted to him could be freely held by him or placed in such investments as appear to be generally available in that country. If he were not free to so deal with the money or if he felt any constraint to make voluntary contributions to governmental or political activities or to invest large sums in State bonds, his loss would be much greater.

A witness who formerly resided in Hungary had been the chairman of the American Joint Distribution Committee in that country. Prior to the advent of the Communist regime, he supervised the distribution in that country of large sums of money. Before any funds could be distributed in Hungary, the law required the permission of the Ministry of Public Welfare. That agency of government was already under a Com-

munist minister, although the government was not yet controlled by the Communist party. The witness testified that before granting permission to distribute the American funds, the ministry demanded a part of the money for distribution by it to organizations. An arrangement was finally made to give a fixed percentage of the total sum to the ministry for distribution among such organizations as the ministry determined. The pressure upon the group making the distribution to divert some of the funds to political and propaganda uses was effective even before the party which controlled that particular agency of Government obtained control over the entire Government of the country. Thus, on the basis of the record in this case, there is grave doubt whether even the very limited use which the foreign law seems to recognize would in fact be permitted to the beneficiaries.

We thus have a situation where a foreign national receives an inheritance at a rate of exchange that results in confiscation of the greater part of it, he may spend the balance only for purchases at excessive prices, or he may save it only at the risk of losing it. This can hardly be said to afford him " the benefit or use " of the fund within the meaning of section 269. At the very least, the circumstances now existing in these countries make it appear desirable that such payment be presently withheld.

The consular representatives contend that the record furnishes no real basis for a finding that these beneficiaries could not henceforth freely enjoy and use the funds. We must bear in mind that any direction now given by the court is not conclusive against the beneficiaries in any subsequent attempt to collect the funds. In the ordinary proceeding where a finding of fact will become *res judicata*, the burden of proof rests upon the party asserting the fact. Here, it is true, the important fact is whether the beneficiary may use and enjoy the funds now and hereafter rather than whether he could use them in the days that are past. However, all that the court is now required to determine is that the facts shown in this record make it appear that the beneficiaries would not now have the benefit, use and control of the moneys or that present circumstances are such as to make it desirable that such payment be withheld. Any determination now made will not bar an application by the beneficiaries whenever it appears that they will have the benefit, use and control of the funds, or that circumstances have changed. In the opinion of the court, the executors have shown sufficient evidence to make it appear that the beneficiaries would not have

the benefit or use of the funds and that it is in the best interests of the beneficiaries that payment should be presently withheld. In the face of the evidence produced by the executors, the consular representatives have furnished no basis for assurance that the beneficiaries will in fact be able to use and enjoy the funds or that it is desirable in the best interests of the beneficiaries that the moneys be given to their consular representatives.

Since the executors will be required to continue administration of the estate, they are directed to hold such funds for the benefit of such legatees. The amount due each beneficiary will be especially earmarked and set aside for him. The executors shall have the authority to invest the money as prescribed by section 21 of the Personal Property Law. Upon completion of the administration of the estate and unless otherwise directed by the court, the amount due each beneficiary together with any income earned thereon shall be deposited with the city treasurer for the benefit of such person.

The accounting executors also ask the court to determine the validity and effect of the gift under the ninth paragraph of the will, which reads: " I give and bequeath to the Town of Balassa Gyarmat, in the Commonwealth of Hungary, the principal sum of Five Thousand Dollars ($5,000.) to be invested in perpetuity by the properly constituted authorities of said Town of Balassa Gyarmat, and the income from said fund shall be used in each year at Christmas time exclusively for the benefit of the poor of the Town of Balassa Gyarmat without distinction of religion." The testator was born in that town and for a number of years prior to 1946, he had given funds during the Christmas season for the poor of that town.

The executors contend that under the Communist regime in Hungary the charitable object of the gift would be frustrated, that the testator had a particular, rather than a general charitable intent, which cannot be executed cy pres, and that the gift lapsed. The Attorney-General agrees that the charitable purpose will not be effectuated through the town government, but he contends that the court should apply the cy pres doctrine, or, in the alternative, hold the funds under section 269 of the Surrogate's Court Act. The Hungarian consular officer argues that the sum should be transmitted to the Town of Balassa Gyarmat.

While the will does not create a trust in the technical sense, the legatee is obligated to use the funds for the uses and purposes and on the conditions prescribed by the donor. (*St. Joseph's Hospital* v. *Bennett,* 281 N. Y. 115.) This court has no confi-

dence that the charitable gift will be faithfully administered by the town officials and accordingly will not direct transmission of the funds at this time.

The executors are directed to hold the sum pending further directions of the court. It may eventuate that prior to the completion of estate administration, conditions may change so that the testator's purpose may be capable of realization. It it not necessary to determine now whether, in the event his expressed purpose fails, the gift lapses or can be executed cy pres.

In respect of the request for instructions relative to the claims against the Hungarian government, the executors' request is not opposed. They will be authorized to continue the administration of the estate in order to collect, if possible, the sums due the testator.

The application of the coexecutor William H. Royce for permission to resign will be granted. The surviving executor may thereupon continue the administration of the estate.

There being no objection to the request for permission to abandon the property described as worthless in schedule B-1 of the account, the application for permission to abandon the property will be granted.

The court has admitted in evidence the proof submitted by stipulation after the hearing in court.

Submit decree on notice settling the account accordingly.