Joseph A. Cox, S.
Two instruments, dated respectively May 24, 1955 and September 21, 1957, were filed for probate, each as the last will of this testator. The 1955 instrument contained a bequest reading as follows: “ I hereby give to my nephew, Jose *884 Greenberg, residing in Bucharest, Roumania, the sum of Ten Thousand Dollars ($10,000.00). This money is to be held in escrow until he leaves Roumania for another country, where he receive this money without fear of forfeiture.”
The 1957 instrument contained a disposition reading: “I hereby give to # * * Jose Tudoran 101 Galea Victoriei, Bucurest, son of my late Brother Oscar Greenberg and his part to be paid only in another country not in Rumania * * * 5,000.00 five thousand Dollar american money.”
The chief of the consulate section of the legation of the Rumanian People’s Republic at Washington, D. C., appeared in the probate proceeding on behalf of Jose Tudoran, also known as Jose Greenberg, a Rumanian national. In the course of the probate proceeding a stipulation was entered into which recited that disputes had arisen between the parties as to the validity of the two instruments offered for probate and the parties were desirous of compromising their respective contentions. The stipulation provided, among other things, that the 1955 instrument be admitted to probate, that the $10,000 legacy to- Jose Greenberg be paid and in addition he should receive 16%% of the residuary estate subject to certain contingent obligations. The share of Jose Greenberg, also known as Jose Tudoran, under the stipulation is said to be approximately $150,000. A decree was made approving the compromise and admitting the 1955 instrument to probate.
Thereafter one of the legatees under the will petitioned for advance payment of his legacy and upon that application a firm of attorneys appeared on behalf of Jose Tudoran by virtue of a power of attorney recorded in this court. The Attorney-General of the State of New York appeared and opposed any payment of the share of Jose Tudoran and asked that such share be deposited pursuant to section 269-a of the Surrogate’s Court Act. The Attorney-General alleged that Jose Tudoran, as a resident of Rumania, would not have the benefit, use or control of any payment to the attorneys in fact. An order was made setting the issue created by the Attorney-General for hearing. Proof has been received.
The burden of establishing that the Rumanian national would have the benefit or use or control of the money or other property due him was upon the attorneys in fact (Surrogate’s Ct. Act, § 269-a). The evidence offered to meet this burden consisted primarily of testimony of an officer of the Rumanian Legation in Washington who stated that by reason of his employment for four years as a lawyer he had become an expert in the estate law of Rumania. This witness testified that a Rumanian resident *885 receives his inheritance in Rumanian currency at the rate of 12 lei for each dollar, which is twice the government controlled rate of exchange for commercial transactions. This witness also testified as to the free use of such money within Rumania although it could not be transmitted outside of that country. The testimony was that a Rumanian must notify the State Bank of any inheritance and must act through an attorney in fact in the collection of the money.
It must be recognized that, whether or not Rumania imposes restrictions within the meaning of section 269-a, it is an iron curtain country under Soviet dominance and, for such reason, facts either as to the operation of Rumanian laws or that country’s monetary practices are not available to an inquirer who might be regarded as influenced by capitalist doctrines. It would appear that this was the unfortunate position in which the Attorney-General found himself. The Attorney-General was able to offer evidence of certain restrictive provisions of Rumanian law governing the ownership and use of property generally and these restrictions are well recognized as consistent with the Communist program of subordinating individual freedom for the material advancement of the Communist state. However, these restrictions do not seem to be peculiar to beneficiaries of foreign inheritances. While the attorneys in fact for the Rumanian national make much of the preferential exchange rate purportedly applicable to foreign inheritances, this argument is premised upon the assumption that an exchange rate of double that available in certain commercial transactions within Rumania is necessarily fair. This assumption can only be as sound as its premise, which is that the normal rate of exchange embodies a modicum of fairness. Casting grave doubt upon the usefulness of this formula is the established fact that Rumanian lei are procurable in this country at a rate of 31% lei to the dollar. Upon this basis the rate of exchange applicable to foreign legacies must be regarded as confiscatory and it cannot be validly contended that a Rumanian who would forfeit such a large portion of his legacy is receiving the benefit or use of $150,000.
No purpose would be served by an analytical discussion of the many points in the briefs as to the text, interpretation and application of the Rumanian Constitution and the laws of that country aimed at formulating a Communist society. Upon all the evidence it is the opinion of this court that the burden of proof imposed by section 269-a of the Surrogate’s Court Act has not been met; The application to compel a payment to the attorneys in fact is denied. Submit order on notice.