Otto C. Jaeger, S.
In its previous memorandum decision of November 30,1965 (Matter of Shefsick, N. Y. L. J., Dec. 3,1965, p. 20, col. 8 [Herman, S.]), this court distinguished Matter of Reidl (23 A D 2d 171, modfg. 39 Misc 2d 805) and directed a trial of the issue as to whether under present conditions the alien distributees herein residing in Czechoslovakia will have the benefit or use or control of their distributive shares if the court were to direct payment to them (Surrogate’s Ct. Act, § 269-a).
Among its reasons for holding Matter of Reidl (supra) as inapplicable, the court noted that unlike Matter of Draganoff (46 Misc 2d 167, 173) (Bulgaria) and Matter of Greenberg (46 Misc 2d 883, 885, affd. with opn. 24 A D 2d 435, mot. for lv. to app. den. 17 N Y 2d 417) (Rumania):
“No testimony was taken in Reidl as to the market place rate of exchange; i.e., the rate of exchange at which the foreign currency actually may be procured.
‘ ‘ If the rate of exchange sought to be applied in this case is not in substantial accord with the market place rate of exchange * * * this would establish that the rate of exchange offered does not reflect the true value of the Czechoslovak crown, and is confiscatory, and that thus the distributees herein would not receive ‘ the benefit or use or control ’ of their shares within the meaning of section 269-a of the Surrogate’s Court Act (Matter of Draganoff, supra, at pp. 173-174; Matter of Greenberg, supra, 46 Misc 2d at p. 885 and 24 A D 2d at p. 435) * * *
“It appears in light of the [determination subsequent to Reidl] of the Appellate Division, First Department, in Matter of Greenberg (supra), that the distributee therein would not *295 have ‘ benefit or use or control ’ of his distributive share because of the substantial differential between the rate of exchange offered and the external rate of exchange, that that court has limited the scope of its earlier decision in Matter of Reidl (supra), where * * * no such proof appeared in the record * * *
‘ ‘ This court will not direct payment of estate funds to Czechoslovakia through the medium of Tuzex certificates until satisfied by competent proof that the rate of exchange sought to be applied herein reflects the true value of the Czechoslovakian crown and is not confiscatory.”
The evidence adduced at the trial, held on March 7, 1966, satisfies the court that the official rate of exchange (referred to in the testimony as the commercial rate of exchange) is 7.14 or 7.15 or 7.16 Czechoslovak or “ standard crowns ” to the American dollar; that use of the Tuzex program results in a rate of exchange of 7.14 “Tuzex crowns ” or “ Tuzex boni ” to the dollar; that one “ Tuzex crown ” is equivalent to two “ standard crowns ”; and that if a Czechoslovakian national changed his Tuzex certificate to Czechoslovak “ standard ” crowns at a Czechoslovak bank, for each 7.15 “ Tuzex crowns”, he would receive 14.30 “standard crowns ”. This establishes that through the use of the Tuzex program a beneficiary of an American estate receives twice the official rate of exchange.
There was testimony that the prices in the Tuzex stores are less than in other Czechoslovak stores for the same kind of merchandise. It was also testified that the purchasing power of the “ Tuzex crowns ” was four to five times higher than that of the “ standard crown ”. The latter contention was not substantiated by evidence of a comparison of the prices of a large list of items sold in both kinds of stores (cf. Matter of Draganoff, supra, pp. 172-173). When a witness was questioned as to whether, when the Tuzex certificates are deposited in the bank, they draw interest of any kind, her response was that she did not know.
There was further testimony that the charge to the purchaser in the United States by local agents for the Tuzex Foreign Trade Corporation of Prague, Czechoslovakia for an order for Tuzex certificates was between 50 cents and $1 irrespective of the amount purchased, with the local agents receiving a 2% commission on all sales from the Tuzex Corporation; that in Czechoslovakia there was a banking charge of $3 to $5 per $1,000 inheritance, but no other charges, duties, taxes or fees, except attorneys’ fees. The amount of the attorneys’ fee depended on whether the case originated “ with a law firm in *296 Prague ”, in which case the fee was 24% (plus disbursements) of the legacy or distributive share: 18% to Messrs. Wolf, Popper, Boss, Wolf & Jones, and 6% to “the law firm in Prague ”; or whether the ease was originally handled by a consular office here, when there would be a fee of 2% for the consular office and an attorneys’ fee of 20% (plus disbursements) to Messrs. Wolf, Popper, Boss, Wolf & Jones.
No proof was offered, although required by the court’s prior decision, as to the market place rate of exchange; i.e., the rate at which Czech currency could be purchased on the “ black ” or ‘ ‘ grey ’ ’ market or in New York banks.
The petitioners urge that Tuzex certificates are not a medium of exchange but are only gift certificates or prepaid charge accounts, usable only at special stores, and that the marketplace rate of exchange or the rate of exchange for “ standard crowns ” outside of Czechoslovakia is irrelevant. That argument evades the issue. Using the Tuzex program is a method of substituting Tuzex certificates for American dollars payable to beneficiaries in Czechoslovakia by which American dollars are converted to' Tuzex certificates at a certain rate of exchange. If the rate of exchange at which dollars are converted to Tuzex certificates is lower than the fair value of the dollar the difference, in effect, has been confiscated by the Czechoslovakian government.
The rate at which the “ standard crown” is procurable in this country is readily ascertainable. Under the provisions of CPLR 4511 (subd. [d]), the court takes judicial notice that the official rate of exchange of the Czechoslovak crown is an artificial rate, and that this rate, and the rate at which United States dollars may be exchanged through the medium of the Tuzex program, both reflect a substantial overvaluation of the crown, as related to the dollar; and that the rate at which Czechoslovak currency is procurable here is far more favorable than the rate offered through the Tuzex program, and reflects a substantial overvaluation of the Czechoslovak crown.
The added argument that the “ standard crown ” is purely a domestic currency that cannot be legally brought into Czechoslovakia, and that the price at which it is procurable in this country has no relevancy to the issues herein, avoids the issue. A similar argument was rejected by the Appellate Division, First Department, in Matter of Greenberg (supra). The fact remains that people do purchase Czechoslovakian crowns in this country, despite the purported illegality of bringing the currency into Czechoslovakia, and that where as here the internal rate of exchange applicable to estate distributions received *297 from foreign countries is substantially less than the external rate of exchange, this establishes that the distributees or legatees will not have the benefit or use or control of their funds, as required by section 269-a of the Surrogate’s Court Act (Matter of Greenberg, 24 A D 2d 435, supra).
Moreover, the court notes that Czechoslovakia is still listed in United States Treasury Department Circular No. 655 as one of those countries to which the transmittal of Federal funds is prohibited on the ground that there is not reasonable assurance that the payee of the check or warrant will actually receive it and will be able to negotiate it for full value.
The request to permit payment of their distributive shares to the distributees residing in Czechoslovakia through the medium of Tuzex certificates is denied. The funds will be deposited with the Commissioner of Finance of Westchester County.