Marianne **BJARSCH** and Werner Kleiner, Plaintiffs,

v.

S. Samuel **DiFALCO** and Samuel J. Silverman, Surrogates of the County of New York, and Bank of North America, as Trustee under the Last Will and Testament of Hanna Elizabeth Cosgrove, Deceased, Defendants.

No. 68 Civ. 4216.

United States District Court, S. D. New York.

June 8, 1970.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiffs; Martin Popper, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, for defendants DiFalco and Silverman; Samuel A. Hirshowitz, First Asst. Atty. Gen., Warren M. Goidel, Asst. Atty. Gen., of counsel.

Before HAYS, Circuit Judge, and PALMIERI and POLLACK, District Judges.

PALMIERI, District Judge.

The plaintiffs in this action are German nationals and residents of the German Democratic Republic. They are remaindermen of a trust established in the will of a New York resident, Hanna Elizabeth Cosgrove, and are now entitled, under the terms of the trust, to immediate distribution of the remainder. The estate is presently subject to supervision of the New York County Surrogate's Court. This suit, against the two Surrogates of that county named as the defendants herein, seeks a summary judgment requiring the payment to the plaintiffs of money due them under a trust which the defendants caused to be paid into court under section 2218 of the New York Surrogate's Court Procedure Act. The plaintiffs seek a declaration that section 2218 is unconstitutional on its face and as applied. Plaintiffs also seek a permanent injunction restraining the enforcement of that section.

The late Judge Herlands of this Court granted plaintiff's application for the convening of a three judge court pursuant to 28 U.S.C. §§ 2281, 2284.* After the untimely death of Judge Herlands in August, 1969, Judge Pollack was designated to sit as a member of this Court. For the reasons which follow we deny the motions for summary judgment and a permanent injunction, and order that the complaint be dismissed.

By decree dated May 16, 1968, Surrogate DiFalco found that plaintiffs were the legatees under the will of the deceased and ordered a partial distribution to them of their legacies. Subsequently, effective June 22, 1968, the New York legislature amended NYSCPA § 2218 by the addition of a new subdivision 1.[1] The trustee of the estate, the defendant Bank of North America, filed its final account on October 16, 1968, and plaintiffs then consented to a final decree providing for the deposit into court

---

* 300 F.Supp. 960 (S.D.N.Y.1969).

1. Section 2218, New York Surrogate's Court Procedure Act, now reads as follows:

§ 2218. Deposit in court for benefit of legatee, distributee or beneficiary.

1. (a) Where it shall appear that an alien legatee, distributee or beneficiary is domiciled or resident within a country to which checks or warrants drawn against funds of the United States may not be transmitted by reason of any executive order, regulation or similar determination of the United States government or any department or agency thereof, the court shall direct that the money or property to which such alien would otherwise be entitled shall be paid into court for the benefit of said alien or the person or persons who thereafter may appear to be entitled thereto. The money or property so paid into court shall be paid out only upon order of the surrogate or pursuant to the order or judgment of a court of competent jurisdiction.

(b) Any assignment of a fund which is required to be deposited pursuant to the provisions of paragraph one (a) of this section shall not be effective to confer upon the assignee any greater right to the delivery of the fund than the assignor would otherwise enjoy.

2. Where it shall appear that a beneficiary would not have the benefit or use or control of the money or other property due him or where other special circumstances make it desirable that such payment should be withheld the decree may direct that such money or property be paid into court for the benefit of the beneficiary or the person or persons who may thereafter appear entitled thereto. The money or property so paid into court shall be paid out only upon order of the court or pursuant to the order or judgment of a court of competent jurisdiction.

3. In any such proceeding where it is uncertain that an alien beneficiary or fiduciary not residing within the United States, the District of Columbia, the Commonwealth of Puerto Rico or a territory or possession of the United States would have the benefit or use or control of the money or property due him the burden of proving that the alien beneficiary will receive the benefit or use or control of the money or property due him shall be upon him or the person claiming from, through or under him.

(pending the outcome of this action) of the amounts of the legacies remaining after the earlier distribution.

Plaintiffs have made no application for withdrawal of funds from the court depositary after June 22, 1968, the effective date of subdivision 1, nor have the defendants denied any such application pursuant to section 2218 of the NYSCPA. Plaintiffs argue that any application to the Surrogate's Court in this case would be futile because the express language of section 2218(1)(a) requires deposit of funds into court due an alien in plaintiffs' position.

Section 2218 is a "benefit, use and control" provision relating to the right of alien legatees and beneficiaries to receive funds from the estates of New York decedents. The section permits the Surrogate to direct that money or property due an alien beneficiary be paid into court, where it appears that the proposed recipient would not have the benefit, use or control of the funds; further payments are authorized only if made upon court order or judgment. NYSCPA § 2218(2). Where there is uncertainty as to benefit, use and control, the burden is placed on the putative alien recipient to show that he would have such benefit, use and control. NYSCPA § 2218(3). Section 2218(1)(a), effective June 22, 1968, requires the Surrogate to direct payment into court of funds to which an alien beneficiary would otherwise be immediately entitled where the alien is a resident or domiciliary of a country to which funds of the United States may not be transmitted under any federal order, regulation or similar determination;[2] the Surrogate has no discretion in regard to the initial payment of the money or property into court. However, the subdivision goes on to provide that any such money or property shall be paid out only pursuant to an order of the Surrogate or an order or judgment of a court of competent jurisdiction. Section 2218(1)(b) relates to the effect of an assignment by an alien beneficiary of funds paid into court under section 2218(1)(a).

This case brings before the federal courts once more the problem of state legislation governing the distribution of decedents' estates where such legislation involves beneficiaries resident in foreign countries, particularly the so-called Iron Curtain countries. It is abundantly clear that a state has a valid interest in

2. In referring to countries to which funds of the United States may not be transmitted under federal order or regulation, the New York legislature invoked the so-called Treasury List, 31 C.F.R. § 211.2. This list states, in relation to nations included on it, that the Secretary of the Treasury has determined that residents will be unable to negotiate checks or warrants drawn against funds of the United States government for full value. The list was originally compiled because of chaotic communication conditions in the European countries overrun by the German Reich in the early stages of World War II. After the war had ended, the purpose of the list was altered to make it an instrumentality of the foreign relations of the United States with the Soviet Union and its European satellites. The list blocks only checks and warrants drawn against funds of the United States; the Secretary's determination is not binding with regard to private funds, including those from estates of United States citizens.

The list in the immediate post-war period included all of the Soviet-occupied countries of Europe. As relations between the United States and the Soviet Union improved, the list was amended to delete Poland (1957), Rumania (1960), and Bulgaria (1963). Almost contemporaneously with the enactment of the present section 2218(1), the Soviet Union, Lithuania, Latvia, Estonia, and Czechoslovakia were removed from the list. At present, of the European countries, only Albania and the territories within the German Democratic Republic remain on the list.

Announcements amending the Treasury List recite that the information upon which the Secretary's determination rests includes "advice received from the Department of State," and contain the statement that ordinary notice and public procedures are unnecessary "since the amendment involves a foreign affairs function of the United States." E. g., 33 Fed.Reg. 9302–03 (1968).

supervising the distributions of its decedents' estates. The state, in doing so, acts to protect the integrity of such distributions and to implement, so far as possible, the intent of its testators and the intendment of its laws of distribution. As a matter of public policy, New York seeks to make certain that beneficiaries receiving distributions from New York estates will have the benefit, use and control of the funds or property left to them. In furtherance of this policy, New York has provided, in section 2218, for an inquiry into benefit, use, and control where the beneficiaries are residents of foreign countries, and especially those nations under Communist governments.

A premise basic to plaintiffs' position is the constitutional principle that the federal government has been entrusted with exclusive competence in the conduct of the foreign relations of the United States. U.S.Const.Art. 2 § 2, cl. 2; United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Latvian State Cargo & Passenger SS Line v. McGrath, 88 U.S.App.D.C. 226, 188 F.2d 1000, 1002, cert. denied 342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617 (1951). It can be generally stated that a state may not intrude into the exclusive federal domain of foreign relations. One of the questions before this Court is whether section 2218 constitutes a prohibited state interference in the foreign relations field. In their remaining contentions, plaintiffs claim that section 2218(1) deprives them of their property without the due process of law and the equal protection of the laws required by the Fourteenth Amendment.

The Supreme Court has had several opportunities to pass upon the constitutionality of section 2218, but to date the Court has declined to interfere with the operation of the statute. In In re Estate of Leikind, 22 N.Y.2d 346, 292 N.Y.S.2d 681, 239 N.E.2d 550 (1968), the New York Court of Appeals upheld section 2218(2) and (3) against a challenge that the statute was an unconstitutional interference with the foreign relations power. The court held that the section could stand if the New York courts, in applying it, "simply determine, without animadversions, whether or not a foreign country, by statute or otherwise, prevents its residents from actually sharing in the estates of New York decedents." 22 N.Y.2d at 352, 292 N.Y.S.2d at 685, 239 N.E.2d at 554. The Supreme Court dismissed an appeal from this decision for lack of finality, Leikind v. Attorney General of New York, 397 U.S. 148, 90 S.Ct. 990, 25 L.Ed.2d 182 (March 2, 1970). The Leikind appeal was *sub judice* before the Supreme Court at the time this case was argued before us, and counsel appeared to agree that any decision on the merits would necessarily dispose of the issues raised here. In view of the inconclusive result in the *Leikind* case, however, it becomes necessary for us to decide substantially the same questions.

In Goldstein v. Cox, a three judge panel of this Court refused to hold section 2218(2) and (3) unconstitutional without some indication in the case before it that the statute had been improperly applied. 299 F.Supp. 1389 (S.D.N.Y.1968). There the plaintiff contended only that section 2218, as it existed prior to the enactment on June 22, 1968 of subdivision (1), constituted an unconstitutional intrusion into the domain of foreign relations; claims of deprivation of due process and equal protection were not raised. The Supreme Court dismissed the appeal from this decision on jurisdictional grounds. 396 U.S. 471, 90 S.Ct. 671, 24 L.Ed.2d 663 (1970).

Additionally, in In re Marek's Estate, 11 N.Y.2d 740, 226 N.Y.S.2d 444, 181 N.E.2d 456 (1962), the New York Court of Appeals affirmed a Surrogate's dismissal of a Czechoslovak beneficiary's application to withdraw funds deposited into court under the predecessor provision to section 2218. The Supreme Court dismissed the appeal for want of a substantial federal question, Justice Douglas dissenting. Ioannou v. New York, 371 U.S. 30, 83 S.Ct. 6, 9 L.Ed.2d

5 (1962). Six years later, the Supreme Court again declined to intervene and denied a motion for leave to file a petition for rehearing. Ioannou v. New York, 391 U.S. 604, 88 S.Ct. 1864, 20 L. Ed.2d 843 (1968). See also In re Braier's Estate, 305 N.Y. 148, 111 N.E. 2d 424, appeal dismissed sub nom. Kalmane v. Green, 346 U.S. 802, 74 S.Ct. 32, 98 L.Ed. 334 (1953).

By contrast, the Supreme Court has twice reviewed analogous provisions in the laws of other states. In Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947), the Supreme Court was faced with a challenge to the California alien beneficiary statute, also relating to claimants residing within territory now included in the German Democratic Republic. The California statute was a general reciprocity provision, permitting alien beneficiaries to take property of a California decedent if a United States citizen had the same rights to receive property from an alien under the laws of the foreign jurisdiction. In rejecting the claim that the statute was unconstitutional on its face as an intrusion into the power of the federal government to conduct foreign relations, Justice Douglas set out the Court's general thesis:

> Rights of succession to property are determined by local law * * *. Those rights may be affected by an overriding federal policy, as where a treaty makes different or conflicting arrangements * * *. Then the state policy must give way * * *. But here there is no treaty governing the rights of succession to the personal property. Nor has California entered the forbidden domain of negotiating with a foreign country * * *

or making a compact with it * * *. What California has done will have some incidental or indirect effect in foreign countries. But that is true of many state laws which none would claim cross the forbidden line.

331 U.S. at 517, 67 S.Ct. at 1439 (citations omitted).

Twenty-one years later the Court considered another challenge to state limitations on the receipt of funds by an alien beneficiary in Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968). The Oregon provision which was called into question, again by East German beneficiaries, included both reciprocity and benefit, use and control tests. Justice Douglas, again speaking for the Court, declined to reexamine the Court's holding in Clark v. Allen, *supra,* that a general reciprocity clause did not on its face intrude on the federal domain of foreign affairs.[3] *Id.* 389 U.S. at 432, 88 S.Ct. 664. The Court found, however, that the Oregon state courts, including its highest court, had searched for the "democracy quotient" of the scrutinized foreign regime and had been led

> into minute inquiries concerning the actual administration of foreign law, into the credibility of foreign diplomatic statements, and into speculation whether the fact that some received delivery of funds should "not preclude wonderment as to how many may have been denied 'the right to receive' ".

389 U.S. at 435, 88 S.Ct. at 668. The Court stated that such inquiries inescapably affect international relations in a persistent but subtle way. In concluding, the Court noted that the Oregon

---

**3.** Justice Douglas noted, however, that the Supreme Court in *Clark* was not concerned with the manner of application of the California statute and that the case at that time "seemed to involve no more than a routine reading of foreign laws." 389 U.S. at 433, 88 S.Ct. at 667. He stated that if the statute in *Clark* had been presented to the Court with a history of application similar to that of

the Oregon statute, the Supreme Court would have decided *Clark* differently. *Id.* One case was cited as an example of improper application of the California statute, Estate of Gogabashvele, 195 Cal.App. 2d 503, 16 Cal.Rptr. 77 (1961), and the Court quoted a commentator's uncomplimentary description of the decision. 389 U.S. at 433 n. 5, 435 n. 6, 88 S.Ct. 664, 19 L.Ed.2d 683.

statute had a direct impact on foreign relations.[4]  *Id.* at 441, 88 S.Ct. at 664.

Justices Stewart and Brennan concurred, but would have gone further than the majority, since

Any realistic attempt to apply any of the three criteria [of the Oregon statute] would necessarily involve the Oregon courts in an evaluation, either express or implied, of the administration of foreign law, the credibility of foreign diplomatic statements, and the policies of foreign governments.

389 U.S. at 442, 88 S.Ct. at 671 (concurring opinion).

■ The *Clark* and *Zschernig* decisions together can be construed to mean that statutes restricting the rights of alien beneficiaries to receive inheritances of United States citizens do not inherently constitute an intrusion into the foreign affairs area. At the same time, in applying such statutes, whether the law be a reciprocity provision or a benefit, use and control provision, they appear to warn the state courts not to inquire into or evaluate the administration of foreign law, or the credibility and policies of foreign governments. Thus, a court is limited to a "routine reading" of a foreign country's laws or a "just matching" of such laws with the laws of the state involved. Zschernig v. Miller, *supra* 389 U.S. at 433, 88 S.Ct. 664; see Matter of Kish, 52 N.J. 454, 246 A.2d 1 (1968); Note, Alien Succession under State Law: The Jurisdictional Conflict, 20 Syr.L.Rev. 662, 673 (1969); Note, Foreign Affairs—Decedents' Estates, 3 Int'l Lawyer 701 (1969).

Against this background we take up the specific arguments in the case.

### The Claim of Intrusion into the Area of Foreign Relations

■ Plaintiffs contend that section 2218 constitutes, on its face, an unwarranted intrusion into foreign affairs. The short answer to this contention is that on two occasions the Supreme Court has ruled that such provisions do not. Clark v. Allen, *supra;* Zschernig v. Miller, *supra.* The Oregon statute before the Court in *Zschernig* was similar to that of New York and included provisions relating to benefit, use and control which the Supreme Court considered. Moreover, the three judge panel of this Court in Goldstein v. Cox, *supra*, had this contention before it and upheld, *sub silentio*, the constitutionality of the general statutory plan of New York. The later addition of subdivision (1) to the New York statute does not materially affect our consideration of the foreign affairs intrusion issue. Accordingly, this Court is not warranted in holding that section 2218, considered as a whole, or any of its subdivisions considered separately, is unconstitutional on its face, as an improper intrusion into the foreign affairs field on the part of the state of New York.

In considering the application of section 2218, we note, as did the Supreme Court in *Zschernig*, 389 U.S. at 437 n. 8, 88 S.Ct. 664, that the New York courts have in the past made denigrating, evaluative statements concerning the governments in Eastern Europe. *E.g.*, In re Klein's Estate, 203 Misc. 762, 123 N.Y.S.2d 866, 870 (Sur.Ct.1952); In re Getream's Estate, 200 Misc. 543, 107 N.Y.S.2d 225 (Sur.Ct.1951).[5]  We also

---

4.  Although East Germany was included on the *Zschernig* case was decided, the Supreme Court made no mention of the list. It is unclear what significance, if any, the list had in proceedings before the Oregon courts.

5.  In the *Klein* case, the Surrogate stated It is a matter of common knowledge that the Communist theory of government

ment is entirely different than the theory of government operated in the free world * * *. The Communist plan is to dominate and rule the world * * *. Marx wanted a world in which people owned no property, and took orders without question. The rights of the individual were to be destroyed, and this policy has been continued and enforced, even to the destruction of the individual in opposition.

note that, absent explicitly derogatory statements, the New York courts prior to the *Zschernig* decision customarily conducted extensive inquiries into the potentiality of actual receipt and went well beyond a routine reading of the foreign law. *E.g.*, In re Shefsick's Estate, 50 Misc.2d 293, 270 N.Y.S.2d 34 (Sur. Ct.1966); In re Wells' Estate, 204 Misc. 975, 126 N.Y.S.2d 441 (Sur.Ct.1953). In one case, the Surrogate's inquiry involved an on-site inspection of conditions through an exhaustive personal investigatory trip to Poland. Matter of Krasowski, 28 A.D.2d 180, 283 N.Y.S.2d 960 (3d Dept.1967), aff'd 22 N.Y.2d 827, 192 N.Y.S.2d 919, 239 N.E.2d 658 (1968).

However, it is appropriate here to limit consideration of the application of the statute to cases decided after the *Zschernig* decision placed the state courts on notice of the constitutional strictures involved in this area. In the *Leikind* case, *supra*, the New York Court of Appeals considered the impact of *Zschernig* on New York proceedings and stated its opinion that the Supreme Court decision did not preclude application of section 2218, "provided [New York] courts did no more than 'routinely read' foreign laws and provided there was no palpable interference with foreign relations in their application." 22 N.Y.2d at 351–352, 292 N.Y.S.2d at 685, 239 N.E.2d at 553. The opinion in *Leikind*, which the Supreme Court has declined to review at this time, indicates not only an awareness on the part of New York's highest court of the problems posed by *Zschernig* in the application of section 2218, but also a bona fide attempt to bring New York's practice into conformity with the views of the Supreme Court.

Additionally, in opposing a motion for leave to seek reargument in Ioannou v. New York, *supra*, after the *Zschernig* decision, the New York Attorney General represented to the Supreme Court that the aggrieved party might make a new application for withdrawal of impounded funds, in the light of changed circumstances. The Supreme Court stated, in a single paragraph opinion, that the motion was denied on the basis of this representation. 391 U.S. at 604, 88 S.Ct. 1864, 20 L.Ed.2d 843. Thus, the chief law officer of the state acknowledged the impact of *Zschernig*.

Against these two positive indications of compliance, this Court has been unable to find any recent instances of improper application of section 2218. The courts in *Leikind* and *Goldstein* found no improprieties in the records of the cases before them. We find none here. In searching beyond the confines of the record in the case before us, we have not found any case which sufficiently demonstrates proscribed activity by the New York courts after the *Zschernig* decision. While we recognize that there are relatively few cases, it appears clear that the New York Court of Appeals has acted with due regard for the constitutional limitations involved and that the lower courts will be subject to its guidance and control.

In sum, section 2218 of the New York Surrogate's Court Procedure Act does not constitute, either on its face or by its post-*Zschernig* application in the New York courts, an unwarranted intrusion in the foreign affairs domain.

### The Claim of Deprivation of Due Process

Plaintiffs next contend that section 2218(1) constitutes a deprivation of due

In the *Getream* case, the Surrogate was even more explicit in stating his feelings, any evidence before the court notwithstanding:

Concededly Hungary is one of the captive countries behind the iron curtain whose nationals are subject to those conditions of which the western world

is well aware * * *. Since Hungary is a member of this bloc of Communist captive countries, this Court would consider sending money out of this country and into Hungary tantamount to putting funds within the grasp of the Communists.

process of law. They argue that under the language of section 2218(1)(a), once it is established that an alien beneficiary resides in a nation included on the Treasury List, 31 C.F.R. § 211.2, the Surrogate must order the deposit of the money or property into court. No opportunity is provided for the alien to be heard, or to show that he would actually have the benefit, use or control of the funds. Thus plaintiffs, as residents of the German Democratic Republic, have been deprived of their property without due process of law.

■ The fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right for which constitutional protection is invoked. Louisville & Nashville R. R. v. Schmidt, 177 U.S. 230, 20 S.Ct. 620, 44 L.Ed. 747 (1900); Anderson National Bank v. Luckett, 321 U.S. 233, 246, 64 S.Ct. 599, 88 L.Ed. 692 (1944); Department & Specialty Store Employee's Union v. Brown, 284 F.2d 619, 628–29 (9th Cir. 1960), cert. denied 366 U.S. 934, 81 S.Ct. 1659, 6 L.Ed.2d 846 (1961); Boone v. Wachovia Bank & Trust Co., 82 U.S.App.D.C. 317, 163 F.2d 809 (1947). Due process here must be determined "by taking into account the purposes of the procedure and its effect upon the rights asserted and all other circumstances which may render the proceeding appropriate to the nature of the case." Anderson National Bank v. Luckett, *supra* 321 U.S. at 246, 64 S.Ct. at 606.

■ Under section 2218(1)(a), plaintiffs have no opportunity to be heard prior to the deposit of funds into court. Once the funds have been deposited into court, however, the statute is silent on the question of whether plaintiffs then become entitled to a hearing on benefit, use and control. Section 2218(1)(a) simply prohibits the payment of funds thereafter except on order of the Surrogate or of another court of competent jurisdiction. The statutory language is susceptible of a construction that a hearing as to benefit, use and control would be required if the beneficiaries applied for withdrawal of the funds. The legislative history provides little illumination: the Memorandum of the New York Attorney General submitted to the legislature with the proposal for the addition of the present subdivision (1) to section 2218 indicates, without more, that the amendment was "designed to meet some of the views expressed" in *Zschernig.*

If a hearing were to be provided after deposit of the funds into court, the deprivation of property to plaintiffs would be minimal. The plaintiffs would then have an opportunity to demonstrate that they would have the actual use of the funds, in which case they would become entitled to immediate receipt of the funds under section 2218(2).

■ The state clearly has an interest in protecting the integrity of dispositions of its citizens' funds by way of judicial process; and the regulation of the distribution of its decedents' estates is a proper function of state government. Additionally, we note, without animadversion, that in earlier years there was widespread doubt that aliens living in the countries of Eastern Europe would actually receive funds from American decedents. See, *e.g.,* Danisch v. Guardian Life Ins. Co., 151 F.Supp. 17 (S.D. N.Y.1957). This Court cannot say that New York's procedure is inappropriate or unreasonable where the mandated deprivation is temporary and plaintiffs will have a prompt opportunity to establish their right to immediate possession. The New York Court of Appeals has indicated its awareness of due process considerations in this area. In re Braier's Estate, *supra* 305 N.Y. at 158–159, 111 N.E.2d 424. Accordingly, in the absence of a construction of the subdivision by the New York Court of Appeals, we cannot say that section 2218(1), on its face,

violates the due process clause of the Fourteenth Amendment.

Similarly, in the absence of cases applying section 2218(1), this Court cannot say that it has been applied so as to deprive plaintiffs of their property without due process. It is noteworthy that here no application has been made to withdraw the funds deposited into court. In the case of Estate of Fred Hinz, N.Y. Law Journal, March 10, 1969, p. 17, col. 2, the Surrogate denied an application for withdrawal of funds, ruling that the Treasury List provided a sound basis for the denial in the absence of other evidence, of which none was offered by the applicants. The case implies that an opportunity to present evidence at a hearing was available to the applicants and that the provisions with respect to the Treasury List established only a presumption which could be rebutted by the production of evidence that applicants would in fact have the use and control of their legacies. This Court has found no other case construing section 2218(1). Although the absence of decisions applying the section may be due to the fact that the matter is *sub judice* before us, we nonetheless have no reason to believe that the New York courts would apply the statute to deny these plaintiffs, or others similarly situated, a proper opportunity to overcome the section's mandatory deposit requirement. See Matter of Kish, *supra*; Gorun v. Fall, 287 F.Supp. 725 (N.D. Mont.1968), aff'd 393 U.S. 398, 89 S.Ct. 678, 21 L.Ed.2d 628 (1969).

### The Claim of Equal Protection

Plaintiffs next contend that section 2218(1) is violative of the equal protection clause of the Fourteenth Amendment, both on its face and as applied, in that it requires that aliens in countries included on the Treasury List be treated differently from aliens in non-listed countries and in that it discriminates arbitrarily between residents and non-residents of New York.

The traditional test of equal protection is whether the challenged classification rests upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed; normally a legislative judgment is given "the benefit of every conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious." McLaughlin v. Florida, 379 U.S. 184, 190–191, 85 S. Ct. 283, 13 L.Ed.2d 222 (1964) (dictum); see, *e.g.*, Ferguson v. Skrupa, 372 U.S. 726, 732, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1962); McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960); Salsburg v. Maryland, 346 U.S. 545, 550, 74 S.Ct. 280, 98 L.Ed. 281 (1953).

As the discussion above indicates, section 2218(1) may be construed as simply providing for a rebuttable presumption that aliens in a country included on the Treasury List will not have the benefit, use and control of distributions from New York estates. In implementing its legitimate state interest in the integrity of the distribution of decedents' estates, New York has always considered the Treasury List relevant in making a determination of benefit, use and control. See In re Braier's Estate, *supra*. We cannot say that the conduct by the federal government of its foreign affairs might not have some relation to the potentiality of receipt by an alien beneficiary of funds from an American estate, or that the state acts invidiously when it uses the Treasury List as a rebuttable, evidentiary presumption that an alien living in such a listed country will not have the benefit, use, or control of private funds of American decedents. We note that section 2218(1)(a) now affects residents of only two European countries, Albania and East Germany. In these circumstances the classification in which plaintiffs find themselves is not arbitrary or unreasonable and the differentiation does relate to the legitimate purpose of the statute. This con-

clusion holds true whether plaintiffs' specific class is viewed against the status of other alien beneficiaries, or whether treatment accorded the class of alien beneficiaries taken together is compared to that received by New York residents.

### Conclusion

We find that section 2218, and particularly section 2218(1), is not unconstitutional on its face. In the absence of a relevant history of abusive application of the statutory plan, the Court is unable to say that it is unconstitutional as applied. There is no indication that the New York courts are unable or unwilling to apply section 2218 consistently with the federal constitution. While the permissible scope of state activity in the area of distributions to alien beneficiaries of domestic estates remains unclear, Linde, A New Foreign-Relations Restraint on American States: Zschernig v. Miller, 28 Zeitschrift für Ausländisches Offentliches Recht und Völkerrecht 594, 601–07 (Heidelberg, Nov. 1968); ** it is for the Supreme Court to mark out the permissible areas of state activity. Both the court in the *Leikind* case, 22 N.Y.2d at 352 n. 2, 292 N.Y.S.2d at 685, 239 N.E.2d 550, and the court in the *Goldstein* case, 299 F.Supp. at 1394, anticipated a possible reexamination of the problem by the Supreme Court. We are quite aware of our inability to make any final, authoritative rulings with respect to these statutes. Only further experience with them and the developing case law can provide an appropriate basis for drawing firm lines of demarcation between state and federal interests in this sector. In the present posture of the law there is no infringement on the constitution.

Motions for summary judgment and permanent injunction denied. Complaint dismissed. It is so ordered.

---

** Professor Linde, a Fulbright lecturer in Germany, wrote this article while on leave from the University of Oregon Law School